# EXHIBIT 2



# PRIVATE PLACEMENT MEMORANDUM

## President: D ELROY FIMRITE

efimrite@efglobal.com

V.P. Finance- Mark Boyd: 480-238-4934
V.P. Investor Relations- Don Carroll: 480-570-9315
PPM Manager- Jeff Harper: 480-329-6101

EFG America LLC
1045 E. McKellips Road
Mesa, Arizona 85203

Niehaus Wise & Kalas
7150 Granite Circle, Ste. 203
Toledo, Ohio 43617

CAPITAL0005350

**PRIVATE PLACEMENT MEMORANDUM**                    Memorandum No._____

                                                   _____
                                                   Name of Offeree

## EFG AMERICA, LLC
(A limited liability company organized under the laws of the State of Delaware)

## Series A Investor Royalty Percentage Units

| | |
|---|---|
| **Maximum:** | 100 Investor Royalty Percentage Units |
| **Offering Price:** | $50,000.00 per Unit |
| **Minimum Investment:** | 1 Investor Royalty Percentage Unit |
| **Return on Investment:** | 0.01% of Revenue Per Investor Royalty Unit |
| **Minimum Return:** | 25% per annum |
| **Maximum Offering:** | $5,000,000 |

## Series B Investor Royalty Percentage Units

| | |
|---|---|
| **Maximum:** | 200 Investor Royalty Percentage Units |
| **Offering Price:** | $100,000.00 per Unit |
| **Minimum Investment:** | 1 Investor Royalty Percentage Unit |
| **Return on Investment:** | 0.01% of Revenue Per Investor Royalty Unit |
| **Minimum Return:** | 12.5% per annum |
| **Maximum Offering:** | $20,000,000 |

This Confidential Private Placement Memorandum ("Memorandum") relates to the private offer and sale ("Offering") of designated Investor Royalty Percentage Units (hereinafter "Royalty Units" or "Units") of EFG America, LLC, a Delaware limited liability company (the "Company"). The Units are being offered at a price of $50,000 per Unit to provide capital for the purpose of initially acquiring the plant and equipment of the Company and for initial start-up costs of the plant. The Company will have its corporate headquarters located at 1045 E. McKellips Rd., Mesa AZ 85203. See "USE OF PROCEEDS." The number and units size of each Unit is subject to discretion of the board of managers of the Company.

Investment in the Units involves certain risks and is designed primarily for long term investment and not as a trading vehicle and for investors who have no need for immediate liquidity of the capital invested. See "RISK FACTORS."

**NEITHER THE SECURITIES EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED ON THE ADEQUACY OR ACCURACY OF THE DISCLOSURES CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

CAPITAL0005351

**Series A Royalty Unit Offering**

| MAX 100 UNITS | Price[1] | Commissions[2] | Proceeds to Company[3] |
|---|---|---|---|
| Per Unit | $50,000 | Up to 10% | $45,000 or greater |
| Maximum | $5,000,000 | Up to 10% | $4,500,000 or greater |

**Series B Royalty Unit Offering**

| MAX 200 UNITS | Price | Commissions | Proceeds to Company |
|---|---|---|---|
| Per Unit | $100,000 | Up to 10% | $90,000 or greater |
| Maximum | $20,000,000 | Up to 10% | $18,000,000 or greater |

**The date of this Private Placement Memorandum is December 9, 2014.**

**NOTICES**

Payment for subscriptions of Units will be due when such subscriptions are delivered to us. We have the right, in our sole discretion, to reject any subscription for any reason whatsoever. Additionally, we have the right to accept half unit subscriptions and other consideration for Units in addition to cash. Subscription documents of any subscriber whose subscription is rejected for any reason, including withdrawal of the Offering, will be returned, together with any payment received, including each subscriber's pro rata share of any income earned while the subscriber's funds were on deposit in the escrow account.

By accepting this Memorandum, you agree that you will not disclose its contents to anyone other than your professional advisors, or reproduce it, in whole or in part, without the written consent of the Company.

These securities are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act of 1933, as amended, and the applicable state securities laws, pursuant to registration or exemption therefrom. Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.

Prospective investors should not construe the contents of this Memorandum as legal, tax or investment advice. Each investor should consult his or her own counsel, accountant or business advisor as to legal, tax and related matters concerning his or her investment. Prior to distributing proceeds of the Offering from the escrow account, each offeree or his or her representative(s) or both, has the continuing opportunity to ask questions of, and receive answers from, us or any person acting on our behalf concerning the terms and conditions of the Offering, and to obtain any additional information, to the extent we possess such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information set forth herein. Any representations, whether oral or written, other than those set forth in this Memorandum, and any information, whether oral or written, other than that contained in documents and written answers to questions furnished by us upon request, have not been authorized by us

---

[1] There is no minimum number of Units to be sold in this Offering, and the cumulative maximum number of Units sold will be 300.

[2] The Units will be sold by registered broker-dealers, and directly by the Company through its executive officers and directors. For sales conducted by independent brokers, the Company expects to pay a maximum 10% commission on the sale of such Units.

[3] Before deducting Offering expenses payable by the Company, including legal, accounting, and consulting expenses estimated at $250,000. See "USE OF PROCEEDS."

CAPITAL0005352

and are not to be relied upon. The information presented is as of the date set forth on the cover page hereof unless another date is specified, and neither the delivery of this Memorandum nor any sale hereunder shall create any implications that there has been no change in the information presented subsequent to such date(s).

This Offering is subject to withdrawal, cancellation, or modification by us without notice (unless your subscription documents have been delivered to the Company, in which case notice shall be provided), and is specifically made subject to the terms described in this Memorandum and the attached exhibits and subscription documents. We reserve the right, in our sole discretion, to reject any subscription, in whole or in part, for any reason or to allot to any investor less than the number of Units subscribed.

This Offering is made, and sales of securities will be made, only to a limited number of persons who qualify as accredited investors under Regulation D promulgated under the Securities Act of 1933, as amended.

The sale of the securities is subject to the provisions of a subscription agreement. Investment in the securities should be made only after a complete and thorough review of the provisions of the subscription agreement attached hereto.

The securities have not been registered under the Securities Act of 1933, as amended, or the securities act of any state, by reason of specific exemptions thereunder relating to the limited availability of the Offering. These securities cannot be sold, transferred or otherwise disposed of to any person or entity unless subsequently registered under the Securities Act of 1933, as amended, or the securities act of a particular state, if such registration is required.

CAPITAL0005353

## TABLE OF CONTENTS

Definitions ...................................................................................................................................1

Summary of Offering .....................................................................................................................2

Suitability Standards......................................................................................................................3

Risk Factors ..................................................................................................................................5

Forward Looking Statements..........................................................................................................7

Business........................................................................................................................................7

Management .................................................................................................................................13

Plan of Distribution of Units .........................................................................................................19

Use of Proceeds............................................................................................................................20

Determination of Offering Price......................................................................................................20

Description of Securities ...............................................................................................................20

Legal Matters ...............................................................................................................................21

Additional Information ..................................................................................................................22

## EXHIBITS

Royalty Agreement and Certificate ................................................................................................A

Subscription Agreement for Individuals..........................................................................................B

Subscription Booklet for Entities ..................................................................................................C

CAPITAL0005354

## DEFINITIONS

| | |
|---|---|
| Closing Date: | For each of the Units, the Closing Date will be the date on which the Company has received subscriptions for the maximum number of Units and such subscriptions are accepted and paid for. Such date shall not be later than November 1, 2015, unless extended by Management to not later than December 31, 2015. |
| Company: | EFG America, LLC, a Delaware limited liability company, from which each Investor is purchasing Royalty Units. |
| Escrow Agent: | Niehaus Wise & Kalas, Ltd., 7150 Granite Circle, Suite 203, Toledo, Ohio 43617, with which the Company has executed an Escrow Agreement providing for the Escrow Agent to accept and disburse the funds from Investors pursuant to this Memorandum. |
| Founders: | Douglas Elroy Fimrite and Gate Corporation Limited. |
| Investor: | A purchaser of Units in the Offering. |
| Management: | The group of individuals listed under MANAGEMENT section of this Memorandum, as changed over time in the ordinary course of business. |
| Maximum Offering: | The offer and sale of 100 Series A Royalty Units and 200 Series B Royalty Units, on a cumulative basis, as more fully described in DESCRIPTION OF SECURITIES. |
| Memorandum: | This Confidential Private Placement Memorandum. |
| Offering: | Sale of Series A Units pursuant to this Memorandum in the maximum amount of $5,000,000. Sale of Series B Units pursuant to this Memorandum in the maximum amount of $20,000,000. There is no minimum amount of Units. |
| Organizing Director: | Douglas E. Fimrite |
| Person: | Any individual, partnership, corporation, trust or other entity. |
| Units: | Series A and Series B Investor Royalty Percentage Units, unless specifically specified, the term Units shall apply to both Series A and Series B units. |

1

CAPITAL0005355

## SUMMARY OF THE OFFERING

*The following is a brief summary of the Offering contained in this Memorandum and is qualified in its entirety by reference to the more detailed information included elsewhere in this Memorandum.*

| | |
|---|---|
| Company: | EFG America, LLC, a Delaware limited liability company, in which Investor is purchasing Royalty Units. |
| Securities Offered: | Series A and Series B Investor Royalty Percentage Units |
| Offering Price: | $50,000 per Series A Unit<br>$100,000 per Series B Unit |
| Subscriptions: | The minimum subscription per Investor is 1 Unit, and there is no maximum subscription per Investor, subject to the Company's discretion. |
| Royalty Payment: | The Series A Royalty Units have a 25% minimum annual return and rights to receive a percentage of gross revenues of the Company, as further described in DESCRIPTION OF THE SECURITIES. Each Series A Royalty Unit shall receive the greater of the minimum annual return or 0.01% of the revenue of the Company incurred in the ordinary course of business which excludes therefrom any revenues from the sale of capital assets, including revenue from all affiliates of the Company in North America. Projections of the Royalty Units are provided upon request. Each holder of a Royalty Unit shall have the right to put back to the Company the Royalty Unit after five years based on a purchase price equal to the initial investment plus the present value of five additional years of projected royalties. The Company has the right to call the Royalty Unit after 10 years based on a purchase price equal to the initial investment plus the present value of five additional years of projected royalties. The five year projection shall be based on the average growth rate of the three highest return years on the Royalty Unit. |
| | The Series B Royalty Units have a 12.5% minimum annual return and rights to receive a percentage of gross revenues of the Company, as further described in DESCRIPTION OF THE SECURITIES. Each Series B Royalty Unit shall receive the greater of the minimum annual return or 0.01% of the revenue of the Company incurred in the ordinary course of business which excludes therefrom any revenues from the sale of capital assets, including revenue from all affiliates of the Company in North America. Projections of the Royalty Units are provided upon request. Each holder of a Royalty Unit shall have the right to put back to the Company the Royalty Unit after five years based on a purchase price equal to the initial investment plus the present value of five additional years of projected royalties. The Company has the right to call the Royalty Unit after 10 years based on a purchase price equal to the initial investment plus the present value of five additional years of projected royalties. The five year projection shall be based on the average growth rate of the three highest return years on the Royalty Unit. |
| Use of Proceeds: | We will utilize the majority of the proceeds to pay debt, acquire assets and to expand and automate Plant 1 and Plant 2 operations, and to build |

CAPITAL0005356

|                          | out additional plants to maximum capacities, as further described in USE OF PROCEEDS. |
|--------------------------|---------------------------------------------------------------------------------------|
| Units:                   | There is no minimum number of Units to be sold in this Offering, and a maximum of 100 Series A Units, subject to management discretion and 200 Series B Units, subject to management discretion. |
| Escrow:                  | The Escrow Agent will receive and disburse Investor funds pursuant to this Memorandum. |
| Risk Factors:            | An investment in the Units involves a significant degree of risk. Prospective Investors should read the Risk Factors section of the Memorandum beginning on page 6. |
| How to Purchase Shares:  | You must complete and return the Subscription Agreement in the form attached as Exhibit B or C, as applicable, to the Memorandum and provide wire transfer information, a cashier's check, other electronic form of payment, made payable to the Company or to "Niehaus Wise & Kalas, Ltd." for your entire subscription. The minimum purchase is one (1) Unit and there is no maximum purchase of Units by any single investor. However, we reserve the right to reject all or any part of any subscription. |

3

CAPITAL0005357

## SUITABILITY STANDARDS

INVESTMENT IN THE ROYALTY UNITS IS DESIGNED PRIMARILY FOR LONG TERM INVESTMENT AND NOT AS A TRADING VEHICLE.

Suitability Issues Affecting All Investors. The liquidity of an investment in the Units is severely restricted because there will be no public market for the Units. Prospective purchasers, therefore, should have sufficient liquid assets to meet their immediate financial needs without regard to their investment in the Units.

General Suitability Standards. The Company has adopted general investor suitability standards which each Investor must satisfy and which require each Investor to represent, in writing, among other things, that: (i) the Investor is acquiring the Units for investment and not with a view towards immediate resale or distribution; (ii) the Investor can bear the economic risk of losing their entire investment in the Company; (iii) the Investor's overall commitment to investments which are not readily marketable will not become excessive; (iv) the Investor has adequate means of providing for their current needs and personal contingencies and has no need for liquidity in their investment in the Units; (v) the Investor has evaluated all the risks of investment in the Company; and (vi) the Investor has such knowledge and experience in financial and business matters that the Investor is capable, either alone or together with one or more advisors, of evaluating the merits and risks of investing in the Units.

The suitability requirements for individuals, corporations, partnerships, trusts, or employee benefit plans are more thoroughly set forth in the subscription documents. If any conflict between the foregoing summary and the requirements set forth in the subscription documents exists, the subscription documents, as interpreted by the Company, shall be controlling.

Accredited Investor Requirements. In addition to the Company's general suitability standards, all Investors must be "Accredited Investors," as defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"). The Company intends to apply the following standards in determining the Accredited Investor status of subscribers, as follows:

Individuals. Individuals are required to meet at least one of the following conditions to qualify as an Accredited Investor:

(i) He or she had an individual income in excess of $200,000, or joint income with his or her spouse in excess of $300,000, in each of the two most recent years and he or she reasonably expects an income in excess of $200,000, or $300,000 with respect to joint income, in the current year;

(ii) He or she has an individual net worth, or a joint net worth with his or her spouse, at the time of his or her purchase, in excess of $1,000,000 (net worth for these purposes excluding your home); or

(iii) He or she otherwise satisfies the Company that he or she is an Accredited Investor, as defined in Rule 501 under the Securities Act.

4

CAPITAL0005358

Determination of Suitability.  The suitability standards referred to above represent minimum suitability requirements for prospective purchasers and the satisfaction of such standards by a prospective purchaser does not necessarily mean that the Units are a suitable investment for such purchaser.  The Company may, in circumstances deemed appropriate, modify such requirements in order to comply with applicable state or local laws, rules, or regulations.  The Company will have the right to refuse a subscription for Units for any reason in its sole discretion.

Suitability Issues Affecting Resales.  It is anticipated that comparable suitability standards will be imposed by the Company in connection with any resale of the Units; any such resale is subject to various restrictions and may result in the recognition of a taxable gain or loss.

Method of Subscription.  We may cancel this Offering for any reason at any time regardless of the amount previously so subscribed.

The minimum subscription is 1 Unit and there is no maximum subscription for any single investor, other than the cumulative maximum number of 100 Units being offered by the Company in this Offering.

In order to purchase Units you must:

- Complete and return the Subscription Agreement, an example of which is attached as Exhibit B or C, as applicable, to this Memorandum;

- Make full payment for your subscription in United States currency, via wire transfer or other electronic payment, cashier's check, money order, made payable to the Company or to "Niehaus Wise & Kalas, Ltd., Escrow Agent"; and

- Return your Subscription Agreement and full payment to the Company or to Niehaus Wise & Kalas Ltd 7150 Granite Circle, Suite 203, Toledo, Ohio 43617 in the enclosed reply envelope before the Closing Date.

Failure to pay the full subscription price shall entitle the Company to disregard your subscription. No Subscription Agreement is binding until accepted by the Company, which may, in its sole discretion, refuse to accept any subscription for Units, in whole or in part, for any reason whatsoever.  In determining which subscriptions to accept, we may take into account any factors we believe may be relevant, including the order in which subscriptions are received.  No subscription will be deemed accepted until we deliver written notification of acceptance to the subscriber.  After a subscription is accepted and proper payment received, we will not cancel such subscription, unless all accepted subscriptions are cancelled.

Once we accept a subscription, it cannot be withdrawn.  Payment from any subscriber for Units in excess of the number of Units allocated to such subscriber, if any, will be refunded by mail, including such subscriber's pro rata share of any income earned on such funds while they were on deposit in the escrow account, within ten days of the date of rejection.

Certificates representing Royalty Units in the gross-revenue stream of the Company, duly authorized and fully paid, will be issued as soon as practicable after escrow funds are released to the Company.

CAPITAL0005359

## RISK FACTORS

*An investment in the Units involves a significant degree of risk and you should not invest in the Offering unless you can afford to lose some or even all of your investment. The risk factors described below, in addition to the other information in this Memorandum, should be considered carefully in evaluating whether to make an investment in the Units offered hereby.*

### No Operating History

We are a new business with no operating history upon which to base an estimate of our future performance. Because the Company has not yet opened, we do not have historical financial data and similar information which would be available for a rubber devulcanization business that has been operating for several years. Our prospects must be evaluated in light of the risks, expenses and difficulties frequently encountered by companies in their early stages of development. In order to be successful we need to build our supply and customer bases; develop and retain customer loyalty; respond to competitive developments; attract, retain and motivate qualified management and employees; upgrade our technologies, products and services; penetrate our identified markets; and provide quality and personal service. There is no guaranty that we will be able to accomplish these tasks.

### Intellectual Property Rights

The Company's success depends in part upon its ability to use and protect its proprietary technology and other intellectual property, which generally covers various aspects of its production processes. The Company relies upon a combination of trade secrets, confidentiality policies, nondisclosure and other contractual arrangements and patent, copyright and trademark laws to protect its intellectual property rights. The steps the Company takes in this regard may not be adequate to prevent or deter challenges, reverse engineering or infringement or other violations of its intellectual property, and the Company may not be able to detect unauthorized use or take appropriate and timely steps to enforce its intellectual property rights. In addition, the laws of some countries may not protect and enforce the Company's intellectual property rights to the same extent as the laws of the U.S. Further, while we believe that we have rights to use all intellectual property in the Company's use, if the Company is found to infringe on the rights of others it could be adversely impacted.

### Pricing Volatility

Our earnings are sensitive to price changes in natural rubber and synthetic rubber, and to the availability and price of raw materials:

- Market prices for natural and synthetic rubber are highly volatile. Decreasing costs of natural or synthetic rubber will impact the ability of Company to sell its product, which, at current market prices, is a lower-priced alternative to both natural and synthetic rubber.

- The Company's ability to manufacture its product is based on the availability and favorable price of raw materials. Decreased availability or an increase in price of the raw materials used in the Company's operations will increase the Company's production costs and affect its margins if the Company is unable to pass the higher production costs on to its customers in the form of price increases. Further, if the Company is unable to obtain adequate supplies of raw materials in a timely manner for any reason, its operations could be interrupted or otherwise adversely affected.

### Energy Price Increases

The Company's manufacturing facilities rely principally on electrical power and other energy

6

CAPITAL0005360

sources. High demand and limited availability of energy sources can result in significant increases in energy costs increasing the Company's operating expenses and transportation costs. Higher energy costs would increase the Company's production costs and adversely affect its margins and results of operations. If the Company is unable to obtain adequate sources of energy, its operations could be interrupted.

In addition, if the price of gasoline increases significantly for consumers, it can affect driving and purchasing habits and impact demand for end products that use Company's products as a component, including tires.

**Foreign Distribution and Contracts**

The Company plans to distribute its product to foreign markets, and the licensing agreement for the de-vulcanizing technology is with a company located in Hong Kong. There are a number of risks in doing business abroad, including political and economic uncertainty, social unrest, and sudden changes in laws and regulations. These risks may impact the Company's ability to protect its proprietary technology and to expand its operations in different regions and otherwise achieve its objectives relating to its foreign distribution. In addition, compliance with multiple and potentially conflicting foreign laws and regulations, import and export limitations and exchange controls is burdensome and expensive. The Company's foreign sales also subject it to the risks of international terrorism and hostilities and to foreign currency risks, including exchange rate fluctuations and limits on the repatriation of funds.

**Regulatory Compliance**

The Company is subject to federal, state, local and foreign laws and regulations. Compliance with those laws now in effect, or that may be enacted, could require significant capital expenditures, increase the Company's production costs and affect its earnings and results of operations.

The Company is also subject to legislation governing labor occupational safety and health. The related legislation can change over time making it more expensive for the Company to produce its products. The Company could also, despite its best efforts to comply with these laws, be found liable and be subject to additional costs because of this legislation.

**Competition**

We will encounter competition for raw materials from existing rubber recycling and reclamation operations in the United States and elsewhere. For sale of our products, we will compete with suppliers of natural and synthetic rubber. Some of these competitors have been in business for a long time and have already established their customer base. We currently know of no other product or procedure for accomplishing the output of the Company at the projected operating costs of the Company; however, there may be alternative products, procedures, operation, technical improvements in the industry that will be highly competitive to the operations of the Company. The Company retains its proprietary information and treats the same as an indispensable asset of the operations of the Company. There is no patent protection of the proprietary information of the Company. There may be other competitors that can engineer a similar product and process to that of the Company which may result in the Company losing its competitive edge in the marketplace.

**Management**

We depend on our senior management. The loss of services of members of our senior management team could adversely affect our business until suitable replacements can be found. There may be a limited number of persons with the requisite skills to serve in these positions and we may be unable to locate or employ qualified personnel on acceptable terms.

7

CAPITAL0005361

**Casualty Risks to Collateral**

We intend to continue to maintain insurance or otherwise insure against hazards in a manner appropriate and customary for our business. There are, however, certain losses that may be either uninsurable or not economically insurable, in whole or in part. Insurance proceeds may not compensate us fully for our losses. If there is a complete or partial loss of any of the pledged collateral, the insurance proceeds may not be sufficient to satisfy all of the secured obligations, including the security interest granted in connection with the Units.

## FORWARD-LOOKING STATEMENTS

Some of the information in this Memorandum, including the "SUMMARY OF THE OFFERING," contains "forward-looking statements" concerning the Company and its operations, performance, financial condition and likelihood of success.

You can identify these statements by use of terms such as "expect," "believe," "goal," "plan," "intend," "estimate," "may," and "will" or similar words. These forward-looking statements involve known and unknown risks, uncertainties and other factors, including those described in the "Risk Factors" section and other parts of this Memorandum that could cause our actual results to differ materially from those anticipated in these forward-looking statements.

## BUSINESS

**The Opportunity**

Gate Corporation Limited, a Hong Kong registered company ("Gate Corporation"), has acquired the licenses and rights to certain proprietary technologies in the rubber recycling industry (the "Technology"), and the Company has been formed by the beneficial owners of Gate Corporation for the purpose of exploiting the Technology through processing operations in North American plants, and sales operations worldwide.

Commensurate with this Offering, the Company will issue 100% of its Common Membership Interests to Gate Corporation, in exchange for a license to exploit the Technology, as provided for in a technology license purchase agreement. The Company and Gate Corporation have assigned an arbitrary value to this transaction of $5,000,000. The President of the Company, D. Elroy Fimrite, investor's related to him, and Dr. Ian Hadfield, have control of Gate Corporation.

The Company currently is manually devulcanizing and processing rubber at its Bay City, Texas plant ("Plant 1") under an informal arrangement with Gate Corporation to use the Technology for this limited purpose. Upon the issuance of the Unit(s), the Company will formally secure the license to use the Technology, and will commence automation and expansion activities.

In this Offering, Investors have the opportunity to purchase a royalty stream with certain annual minimum returns, based on the annual gross sales of the Company. The terms and conditions of the purchase of these "Royalty Securities" are more fully set forth below in "DESCRIPTION OF THE SECURITIES."

**Business Strategy**

The principal business of the Company will be to use the Technology to devulcanize waste rubber to produce new rubber compounds suitable for sale to be incorporated in substantial ratios and very large

CAPITAL0005362

volumes in new products as a substitute for new virgin and synthetic rubber compounds. One key advantage to the Technology is that it is, to the Company's knowledge, the only commercial devulcanization process currently available that meets the United States' strict environmental standards and regulations regarding the processing of used rubber.

The Company's tire processing and materials recovery technologies are a complete paradigm shift for the tire recycling industry. The Technology is a chemical devulcanization process that yields a devulcanized master batch compound that can be used in new rubber products in ratios from 25% to 100% depending on the product. In the 170 year history of rubber only one previous devulcanization technology, reclaim rubber, achieved commercial production and market acceptance, but due to the low properties of reclaim rubber and the pollution caused by the process, there are no existing facilities producing reclaim rubber in North America.

The Company's access to the Technology results in a process that is fast, inexpensive, and simple. The devulcanized rubber produced by the Technology has properties approaching virgin rubber and has significant economic benefits for users in ease of handling and processing.

The first phase of the Plant 1 development will be the establishment of an automated rubber devulcanization operation that will rapidly generate substantial revenues for the Company. This facility will purchase whole tire crumb rubber for devulcanization until a process known as "whole tire" processing can be installed at Plant 1. The products resulting from the Company's devulcanization technologies are basic rubber compounds for use in countless rubber products used throughout the world.

In a subsequent expansion phase, whole tires and other waste rubber will be processed at Plant 1, with high quality rubber recovered being devulcanized and low quality rubber being used as a hydrogen content modifier for other waste streams in a blended feedstock for a waste gasification division. The gasification division will blend the various selected waste materials and the low quality rubber waste to achieve targeted hydrocarbon content and gasify the blended waste in a two-stage process to produce clean Synthesis Gas (Syngas) and other high-end products.

## Devulcanization Technologies Generally

The rubber vulcanization process, invented by Charles Goodyear in 1844, created a material with remarkable properties that facilitated the manufacture of a myriad of products, not the least of which is the pneumatic tire. Vulcanization involves a vulcanizing agent such as sulfur being compounded with virgin rubber polymers under conditions of time, temperature and pressure and molded to a predetermined form. When the material is vulcanized it is known as a thermoset material, as the properties were "set" or chemically "locked" by the application of heat. In most thermoset products such as tires, the vulcanizing agent is sulfur, and the sulfur forms chemical cross-links between and within the macro-molecular chains of rubber molecules. Without severing these sulfur crosslinks, the rubber cannot be formed into new products using the "rubber" properties found in the "old" products. The properties of elongation, tensile strength, and others found in the original rubber products cannot be recreated without "devulcanizing" the original rubber product. All prior commercial devulcanizing processes have included the creation of massive amounts of hazardous waste during processing, and are no longer commercially viable in the United States due to environmental rules and standards.

The principal technologies advanced to date include:

### *Reclaim Rubber*

The first devulcanization process that achieved commercial success was a reclaim process in which the rubber is ground to crumb rubber, cheap oil and reclaiming chemicals are added, then the rubber is treated at 200° C and under high pressure for a period of 5-12 hours. The quality of reclaim varies depending on the properties of the rubber being reclaimed, but generally the new product is not of sufficient quality to be used in the majority of industries using virgin rubber to make products. Also, this reclaim process does not work with compounds that contain a substantial amount of synthetic rubber.

9

CAPITAL0005363

*Goodyear Microwave Devulcanization*

In this method of devulcanization, microwave energy is applied to end of life rubber products. The technology can only be applied to compounds with a high degree of polarity, and thus is mostly limited to EPDM compounds (a specialty synthetic rubber compound with a wide range of applications, but not capable of being used in tire manufacturing) and thus is not effective in recycling tire rubber. The technology was patented by Goodyear in 1978 and was used by them for the recovery of EPDM hose ends and out of tolerance batches. The process was used for several years, only on EPDM materials and the Company's understanding is that the process was later abandoned due to unfavorable economics.

*Levgum*

Levgum technology involves mixing a powder "Devulcanizer" into crumb rubber on a mixing mill, running the material through the mill some 20 times to achieve the purported devulcanization. The Company believes that the process does not produce stable and consistent materials for resale. The Company is not aware of any commercial installation for resale of their produced material in North America.

### Testing and Product Development of the Technology

The advanced chemistry needed to solve the environmental problem of rubber recycling was developed in the People's Republic of China and has been acquired under an exclusive North American license by Gate Corporation.[1] The Technology reactivates the recycled rubber by chemically severing the sulfur bonds formed in vulcanization and then capping the sulfur to stabilize the material until it is once again vulcanized for use in new products.

Under the supervision of Paul Standley and Bill Klingensmith, two of the leading rubber experts in the world, the development work and testing of the Technology was completed by Landstar in conjunction with the Akron Rubber Development Lab (ARDL, the leading rubber lab in the world). This testing and product development confirmed the effectiveness (90+ percent of cross-links severed) and consistency of the Technology and that the devulcanized rubber will meet or exceed specifications for many rubber products. This product development included developing a basic rubber masterbatch and a TPE (thermoplastic elastomer) with a 5% to 100% loading of devulcanized rubber. Technical papers regarding the technology have been published by Dr. Li Xing Ru and Paul Standley, and are available upon request.

The most significant findings of the testing work included:

- The maintenance of a high tensile strength in the recyclate

- The severance of essentially all of the sulfur crosslinks

- Negligible reduction in molecular weight

- Malleable processing characteristics

- Decreased cure time on new compounds using Devulcanized material

A second phase of testing and product development was completed with a distinguished polymer chemist, Dr. Gary Zeller, resulting in the development of a number of products that use substantial loadings of devulcanized material. The results include emulsions, foams, impact modifiers and asphalt modifiers,

---

[1] Rebound Rubber Corporation, formerly a subsidiary of Landstar Inc., held certain North American rights relative to the Technology and conducted all of the technology transfer work for commercial production in the United States. Rebound Rubber Corporation built and operated a pilot facility in Dayton, Ohio that fully automated the production process and cleared all requirements for environmental permitting and OSHA standards for workplace safety. Gate Corporation has acquired all former Landstar and Rebound Rubber Corporation rights, intellectual property, product development documentation and marketing data with respect to the Technology. Supporting documentation is available upon request.

CAPITAL0005364

and the application of these materials in: roofing materials, water-proofing, traction coatings, crack sealants, insulation, soundproofing material and molded rubber goods. Supporting information for this information is available upon request.

## The Upstream and Downstream Global Rubber Markets

### Virgin Rubber Market

The global production and consumption of rubber is currently approximately 57,000,000 metric tons annually, consisting of about 50% natural rubber and 50% synthetic rubber. This virgin rubber when compounded with other ingredients results in gross compound volumes approaching 60,000,000 tons. The demand for natural rubber is predicted to increase over the next several years by nearly 5% per year, while production is expected to lag and has actually declined in the past year due to drought and diversion of farmland to other crops. The International Rubber Board previously predicted an 800,000 metric ton shortage of natural rubber over the next few years.

### Waste Rubber Market

The Rubber Manufacturers Association (RMA) publishes a biennial report on the scrap tire markets in the United States and the most recent report is for 2009. The results of this study concluded that the country continues to generate approximately one scrap tire per capita per annum and that "in 2007, 89.3 percent of the scrap tires generated in the U.S. by weight were consumed in end-use markets." Many of these companies also operate in other jurisdictions where legislation has or will make them responsible for end of life responsibilities for tires. RMA promotes the concept that scrap tires are a resource that can be used in a wide array of applications. Under the RMA classification structure, tire derived fuel, the burning of tires, constitutes an end-use market, even though for many TDF users the tire collectors must pay the TDF user to burn the tires. Similarly, usage as landfill ground cover, septic tank leach fields, civil engineering applications and other construction applications are "paid" by the tire collector to be an "end-use market".

### Tire Recycling

Tire Collection is largely a disorganized industry populated my many small operators, often a guy with a truck. In some jurisdictions landfill operators provide long term contracts to collection operators who in turn locate or operate processing facilities. The principal exceptions to that profile are the nationwide operations of Lakin Tire, who collect, sort and resell used tires and casings and processing tires to manufacture mulch for resale, and Liberty Tire who principally processes tires for TDF markets. Since only 17.2% of tires are processed into ground rubber, the reality of the breakdown of the 89.3 % consumption of scrap tires consumed by end-use markets is that 17.2 % is consumed by an end-use market, 2.2% are exported to become some other countries problem and 69.9% are disposed of in an acceptable waste-disposal manner: incinerated or buried. A further analysis of the 17.2% shows that 6.2 % is used in sports fields, mulch and playground applications, therefore a mere 11% of rubber gets recycled as any usage approaching its original application in society.

### Post-Industrial Scrap

Post industrial waste is also a significant problem and is an excellent source of rubber for devulcanization. This waste includes flash from molded products, defective products, stale rubber (partially naturally cured through ambient heat and excessive storage), and compound batches that have experienced processing difficulties and typically need to be cured to complete the vulcanization, then devulcanized. The advantages of post-industrial scrap is that it is usually new material, usually separated by specific formulation and does not contain several different compounds of rubber as does whole tire crumb. In addition, there is typically no contamination of fiber or steel as is possible with tire crumb. Much of this waste currently goes simply to landfill, the Company is only aware of one facility that processes this type of material to granulate.

11

CAPITAL0005365

*Post-Consumer Waste*

With the exception of tires, very little, if any, post-consumer rubber products are recycled. There are two reasons for this, the first being that the number and diversity of rubber products makes collection for recycling almost impossible. The US EPA data for solid municipal waste composition analysis combines rubber and leather as a single composition component. In 2008 the EPA total rubber and leather disposed of in municipal waste was 7.4 million tons, presumably mostly rubber. The second reason for insignificant recycling of post-consumer rubber is the extremely large variety of compounds used in the myriad of products. In the automotive industry all of the rubber parts on an automobile other than the tires are referred to as SKOR, an acronym for Some Kind Of Rubber. For these reasons it is not practical to consider these materials for devulcanization with the exception of SKOR recovered from recycled automobiles. Under European legislation manufacturers of automobiles must assume responsibility for end of life disposal commencing in 2015. Under the rules of disposal, the auto recycling will force the industry to recycle SKOR which will ultimately drive another devulcanization opportunity.

*Devulcanized Rubber Market-Reclaim Rubber*

The production and sale of devulcanized rubber is not new, the rapid expansion of the production of reclaim rubber during the second world war saved the allied war effort from a major crisis as all of the Southeast Asian rubber production fell into Japanese hands. The continuation of the production of substantial amounts of reclaim rubber in India and China, even with its very poor properties, is a strong indicator of the market opportunity for the Company's higher-quality devulcanized rubber compounds.

*Termination of Offering*

This Offering may be terminated by the Company at any time in its sole discretion.

CAPITAL0005366

## MANAGEMENT

### Management

Executive management of the Company is composed of seven (7) individuals, each of whom has experience in the rubber recycling and de-vulcanization industries. We believe that the combined experience of these individuals will provide the Company with the business and management acumen necessary to achieve profitability. The background, experience and professional highlights of each member of Management are summarized below:

### Douglas Elroy Fimrite – President and Chief Executive Officer

Elroy has been a self-employed entrepreneur for over 30 years. For the last 15 years, he has focused on rubber recycling and other environmental initiatives. Elroy has extensive experience in a broad array of additional areas, including real estate development, operations management, oil industry operations, corporate reorganization, financial administration, financial systems design and implementation, general management, public company administration, data processing, auditing and business education. Elroy has a Bachelor of Commerce degree from the University of Alberta, Canada, was a professional management accountant and has extensive experience and training in Management, Planning and Control of Information Systems.

Elroy's involvement in the tire recycling industry began in 1996, founding a company that acquired rights to a Chinese rubber de-vulcanization technology, the only commercially viable de-vulcanization technology in the world. Elroy completed the technology transfer to the United States; developed a pilot facility to automate, prove and improve the process and properties; completed a testing and verification process; completed a new material product development process; became the largest tire recycling company in the world and developed a myriad of relationships in the rubber recycling industry globally. Under Elroy's leadership, the company operated four facilities in the United States with a combined capacity to process 200 million pounds of particulate rubber. The operational business units were disposed of and the company was placed on hold in 2003 due to the very low rubber prices at that time.

Elroy served on the Board and as President of Landstar Inc (Public) (2000-2007) and SNRG Corp (Public) (2004-Present). Elroy has made over 75 trips to China; has spent several years in the Middle East and has been a member of ETRA, the European Tyre Recycling Association for most of the past fifteen years.

### Steven J Renegar, Vice-President Sales and Marketing

Steve is a dynamic senior-level, high performance executive with a proven ability to build and lead top-flight sales/marketing teams. Steve has an MBA from the University of Texas, a MS Degree from Pittsburg State University and a BA (Chemistry) from Southwestern College. He has taken multiple professional development courses, including Strategic Account Management Course, Southern Methodist University, Managing for Consistency Course, Tennessee Associates and Upper Management Seminar Course from Southern Methodist University.

Steve's extensive industry experience includes serving as the President and CEO, from 2008 – present, of Renchem International, Inc., which focused on servicing the international rubber, chemical and plastics industry. Steve oversaw the company's services, including consulting, product/company representation, chemical brokerage, brokerage of raw materials globally including EPDM, ESBR (synthetic rubber), carbon black and rubber chemicals. Before joining Renchem, Steve directed and managed the sales operations for several corporations, and was responsible for developing and implementing corporate marketing policies and procedures and for formulating strategic plans and sales literature. Steve's industry experience includes sales of synthetic rubber and carbon black. Prior to moving to sales, Steve worked as a compounding chemist for a major tire manufacturer.

Steve was a member of ASTM D11 (Rubber) and D24 (Carbon Black)-Main Committee Secretary to D24 for eight years, and served as United States Representative to the International Standard

13

CAPITAL0005367

Organization (ISO). Steve was appointed to the Engineered Carbons Inc. Board of Working Directors in 1999.

Bonnie E Allen, Chief Financial Officer

Bonnie, age 53, graduated with a BS degree (Business and Accounting) from the University of Maryland and has an extensive background in various accounting and financial positions. Bonnie's business and accounting career began in 1981 at Marriott Headquarters in Bethesda, Maryland, working as a Corporate Accountant directly for Richard Marriott who headed the Restaurant Division. Bonnie then became a Division Controller for the Marriott Suites Division and was also trained as a Marriot Hotel Controller.

In 1992 at Thayer Lodging Group, a spin off from Marriot Hotels, Bonnie was responsible for all accounting and financial aspects of one of the largest privately held Hotel Venture Funds. Besides her duties as Vice-President and Treasurer of the company Bonnie was responsible for investor relations, financial reporting and distributions of all profits. Reporting to Fred Malek, Chairman of the Board and former campaign manager for President George H. W. Bush, vaulted Bonnie into becoming President of the Greater Fort Lauderdale Lodging and Hospitality Association. Bonnie was responsible for all management, administration and coordination of one of the largest non-profit organizations in Broward County representing the business and hospitality community.

Beginning in 2000, Bonnie has been a Business Consultant to various Fortune 500 companies where she assists with unique sales, financial and technology training strategies. Bonnie holds licenses in Health, Life and Annuities; Series Three with the National Futures Association and Real Estate.

W Clay Richards, Vice President Finance and Investor Relations

Clay is a proven management professional with over 20 years of experience in sales, marketing and leadership positions. Clay graduated with a B.S. (Business Management, Marketing/Finance) from the Northern Arizona University, Flagstaff, Arizona. He has taken multiple professional development and continuing education courses, including course work in both an MBA program and a Sports Management Program, as well as those related to negotiation, public speaking, account management and front line leadership.

Clay's recent employment experience includes serving as a business broker and investment advisor for Apiron Investments Inc. (2004-Present), where he was recognized as the 2006 Top Earner and received a the Multi-Million Dollar Earner award. Prior to that, Clay served as Vice President of Marketing & Sales for Landstar Inc/PolyTek, and held has held executive sales and marketing positions for over 25 years.

R.W. Phillip Pimlott, Vice President, Chief Information Officer

Phil, age 65, is a senior systems specialist. After completing his Computer Systems accreditation in 1969 he began his multi-faceted career in the Information Technology industry with Shell Canada Ltd. (1969-1971) before being recruited by Pacific 66 (1971-1974); the British Columbia Systems Corporation (1974-1983) and Computech Consulting, (1983-1986).

In 1986, he incorporated his own consulting company, Five Star Systems Ltd., before co-founding and managing Syscom Consulting Inc., a computer systems and network support organization with a staff of over 50 technical personnel located throughout British Columbia. Syscom was purchased in 1997 by ISM-BC, a large international firm specializing in systems integration.

Phil joined Landstar Inc. as a Management and Systems Consultant and was subsequently appointed Executive Vice-President. Phil served on the Board of Directors of Landstar Inc. (1999-2004) and Rebound Rubber Corp. (1999-2004). He has subsequently served as an Executive Vice President and Director of a company operating in both Canada and the US.

14

CAPITAL0005368

<u>Jerry W. Kendrick, Vice President, Chief Operating Officer</u>

Jerry, age 63, graduated with a B.S. (Business Administration) from Central Michigan University. Jerry has an extensive background in all facets of manufacturing operations and plant management including: recruiting, training, supervising the work force necessary to meet all production requirements in a plant commissioning environment; direct all aspects of plant operations including inside sales, purchasing, planning, quality control, maintenance, production, warehousing, shipping and receiving; continuous improvement training and lean manufacturing techniques; design plant layouts, assembly lines and assembly equipment.

Jerry's extensive experience includes: Challenge Manufacturing, (2004-Present), Manufacturing Manager; Landstar Polymer Recovery, (2001-2003) Pilot Plant Manager, supervised test production program for Landstar Devulcanized Rubber product and process development program in Dayton Ohio, Plant Management of Landstar's Flatrock MI tire recycling facility; Aerotek Inc, (1999-2000), Materials Planning Specialist, General Motors/Del-Met/JCI JV, injection molded parts; LifeSavers, (1995-1999), Operations Supervisor, CICE (Continuous Improvement for Continuous Employment) and QCDSM (Quality Cost Delivery Safety Moral); Windward Products, (1990-1994), Plant Manager, metal fabricating and assembly plant manufacturing aluminum exhaust vents.

<u>Troy L. Corriveau, Vice President, Chief Administrative Officer</u>

Troy graduated with a Business Degree from Brigham Young University, a B.S. (Liberal Studies) from Regents College of New York and a Doctor of Chiropractic, Magna Cum Laude, Palmer College of Chiropractic. Troy has over twenty years of management experience in multiple environments including the Far East where he managed humanitarian efforts in four Southeast Asian countries. He is fluent in Thai and conversationally fluent in Spanish and French.

Troy has strong skills in start-up and turn-around environments, has led project management, process management, planning and strategy initiatives. His professional experience includes: topjobsusa.inc, Director of Planning, Sales and Marketing; Greenway Montessori, President; DISx, Chief Operations Manager; Thailand Bangkok Mission, Administrator; Today's Cabinets and Flooring, Chief Operations & Financial Manager; Corriveau Chiropractic Clinic, Doctor of Chiropractic.

Troy has an extensive history of community service including: Volunteer, Quality Control, Swiss Days, Midway, Utah; Volunteer, Registration and Supervision, Provo Independence Day races; Volunteer Representative, ecclesiastical unit, Bangkok, Thailand; President, ecclesiastical and humanitarian efforts in Thailand, Cambodia, Myanmar, and Laos

**Directors**

The Company's Board currently consists of four (4) directors, all appointed effective May 1, 2013. At each annual meeting of shareholders, successors to the directors whose term expires at the annual meeting will be elected for three-year terms.

The following table sets forth the names, ages, classes and positions of directors of the Company:

| Name | Age | Position with Company |
|---|---|---|
| D. Elroy Fimrite | 65 | Director, President, Chief Executive Officer |
| Carl Buccellato | 71 | Director |
| Ian Hadfield | 69 | Director |
| James Kyle | 68 | Director |

The experience and background of the directors (other than Mr. Fimrite) of the Company are summarized below:

15

CAPITAL0005369

Carl Buccellato, Director

Carl, age 70, is a senior executive with forty years marketing and upper management experience in both private and public companies. As a successful entrepreneur, Carl founded three start-up companies, developed and maximized their value, sold two of them and took the third company public.

As founder, CEO, President and Chairman of Homeowners Association of America, Carl directed the development of the largest member association in the real estate industry with 27,000 realty firms and 247,000 sales agents, participating in one in every four resale homes sold in America. Through the application of integrated distribution channels, Carl directed the business model resulting in generating in excess of $200 million in revenues annually.

Carl was also founder and CEO of two offshore captive insurance companies, and a publicly traded United Kingdom Marketing Firm. As CEO of a multi-national company, Carl created innovative insurance products that gained number one market status.

Carl brings a great deal of experience to the Board, having served (and currently serving) serving on the boards of: Elliemae.com. Inc. (1997-Present-public NYSE), Landstar Inc. (2000-2007-public), C.I.S. UK. (1990- Present-public); UltraStrip Inc. (2002-2006-public); Netstaff Inc. (1999-200-public); CeleXx Corp. (2000-2001-public), ChoiceHire.com Inc. (2000-2001), SeaPlanes Inc. (2000-2002), and PhyloMed. Inc. (2000-2003).

Dr. K. Ian Hadfield, Director

Ian, age 68, graduated from the University of Victoria with a BSc. and the University of Alberta receiving a DDS in 1970. Ian practiced dentistry until 1977 and then attended Boston University and received a Specialist Certificate in Periodontics in 1979. Ian has been in private clinical practice until the present. Ian has served as President of the B.C. Society of Periodontists, President of the Victoria and District Dental Society, Specialist Examiner College of Dental Surgeons of B.C., served on numerous provincial committees including Chairman of Government Liaison, Peer Review, Legislation and Provincial Convention Chairman. Ian has received the Provincial Certificate of Merit and holds membership in the American College of Dentists.

Ian's extensive community involvement includes Chairman of the Leadership Division of the United Way, Chairman of the Arthritis Golf Tournament for 8 years, Captain and President of the Victoria Golf Club 1997 – 2000 and as a significant contributor to the Saanich Peninsula Hospital Foundation.

Ian has been involved in the hospitality business since 1986, as a partner and developer of Spinnakers Brew Pub and Guesthouses, as an owner and developer of five properties adjacent to the Victoria inner harbor, and in development of both Brentwood Bay Resort and Spa and Brentwood retail liquor store. Commencing in 2001 Ian has been an active participant and significant investor in the rubber devulcanization industry. He has served on the board of directors of Landstar Inc (2001-2007) and Gate Corporation Limited (Hong Kong Parent of EFG America LLC) (2012-Present).

James Kyle, J.D.

Jim, age 67, graduated with a B.S. from California State College, and continued his education with Thomas Jefferson University School of Law, obtaining his Juris Doctor degree. Jim was President of Nu Beta Epsilon, National Legal Honorary Society, and was awarded American Jurisprudence Awards for Torts and Trial Practice. Jim continued his education with the Veteran Affairs Outreach Program, San Diego State University and completed an Executive MBA Program at Pepperdine University.

Jim had an extensive career in the United States Marine Corps where he was decorated for Valor in Combat. Jim retired with the rank of Captain, and his service included; Basic MOS/Infantry Officer, Company Commander, Infantry Training Regiment, Camp Pendleton, CA/Camp Lejeune, NC, Liaison/Intelligence Officer to initial Vietnamese relocation to Camp Pendleton, CA, Legal Administrative

16

CAPITAL0005370

Officer Staff Judge Advocate, Camp Lejeune, NC, General Aide-de-Camp to, General Hugh Hardy and General Paul Godfrey, U.S. Naval Justice School, First Marine Division Association, Third Marine Division Association and Disabled American Veterans.

After retiring from the Marine Corps, Jim has worked as a consultant and advisor to emerging growth companies in the technology and construction industries. In that capacity, Jim has provided advice regarding strategic planning and capital structure, in addition to linking the companies to key personnel. In addition to his involvement with these business ventures, Jim is an author, whose works include the short story "In Search of Heroes."

**Compensation of Directors**

All Directors, including Directors who are also employees of the Company, will receive a honorarium of $2,500 per month.

17

CAPITAL0005371

## Compensation of Management

The following table states the proposed cash compensation for each of the seven most highly compensated executive officers, each of whom will receive compensation in excess of $100,000.

Summary Compensation Table

| Name and Position | Salary | Compensation as Director | Total Compensation |
|---|---|---|---|
| D. Elroy Fimrite<br>President and CEO | Nil | Nil | Nil |
| Steve Renegar<br>Vice President Sales &<br>Marketing | $180,000 | n/a | $180,000 |
| Bonnie E Allen<br>Chief Financial Officer | $144,000 | n/a | $144,000 |
| W. Clay Richards<br>Vice President Finance and<br>Investor Relations | $144,000 | n/a | $144,000 |
| R.W. Philip Pimlott<br>Vice President & Chief<br>Information Officer | $120,000 | n/a | $120,000 |
| Jerry W. Kendrich<br>Vice President & Chief<br>Operating Officer | $120,000 | n/a | $120,000 |
| Troy L. Corriveau<br>Vice President & Chief<br>Administrative Officer | $120,000 | n/a | $120,000 |

18

CAPITAL0005372

## PLAN OF DISTRIBUTION OF UNITS

We are offering for sale a cumulative maximum of 100 Series A Units and 200 Series B Units. Series A Units will be sold at $50,000 per Unit, and Series B Units will be sold at $100,000 per Unit. The Units will be offered through the efforts of Management, the Organizing Directors, and outside underwriters or broker-dealers will be engaged to assist in the sale of the Units. Management and the Organizing Directors will receive no compensation for their efforts in selling the Units. Outside underwriters or broker-dealers will receive a commission of up to 10% in connection with sales of Units generated by such outside persons.

Subscription documents to purchase Units will accompany this Memorandum and be distributed by Management to prospective shareholders. Units may be subscribed for by delivering the subscription agreement ("Subscription Agreement") in the form attached hereto as Exhibit B or C, as applicable, completed and executed, to the Company, on or before the Closing Date. Subscribers should retain a copy of the Subscription Agreement for their records. The aggregate subscription price is due and payable when the executed Subscription Agreement is delivered. Payment should be made to "Niehaus Wise & Kalas, Ltd., Escrow Agent."

The Company has the right to accept or reject, in whole or part, the Subscription Agreement. Additionally, the Company may accept less than the minimum or more than the maximum number of Units per Investor, in its sole discretion. Subscriptions to purchase Units will be received until November 1, 2015 and extend to December 31, 2015 subject to additional updated information, unless all of the Units are earlier sold or the Offering is earlier terminated or extended by the Company. The Company reserves the right to terminate the Offering at any time or to extend the Closing Date for additional periods, not to extend beyond December 31, 2015. No written notice of an extension of the Offering need be given prior to any extension and any such extension will not alter the binding nature of subscriptions already accepted by the Company.

Following acceptance of the Subscription Agreement by the Company, the Subscription Agreement will be binding on the subscribers and may not be revoked by a subscriber, except with the consent of the Company. In addition, the Company reserves the right to cancel accepted subscriptions at any time and for any reason, until the proceeds of the Offering are released from escrow, and the Company reserves the right to reject, in whole or in part, at its sole discretion, any subscription. The Company may, in its sole discretion, allocate Units among subscribers in the event of an over-subscription for the Units. In determining which subscriptions to accept, in whole or in part, the Company may take into account any factors it considers relevant, including the order in which subscriptions are received, a subscriber's potential to do business with, or to direct customers to the Bank, and the Company's desire to have a broad distribution of stock ownership.

In the event the Company rejects all, or accepts less than all, of any subscription, the Company will refund promptly, the amount remitted which corresponds to the number of Units as to which the subscription is not accepted, including the subscriber's pro rata share of income earned on such funds while they were in the Escrow account.

Certificates representing Units duly subscribed and paid for will be issued by the Company promptly after the Offering conditions are satisfied and escrowed funds are delivered to the Company.

CAPITAL0005373

## USE OF PROCEEDS

During the Offering of Units, capital will be used generally to purchase assets, settle debt, fund management and overhead expenses, sales and marketing efforts, and other normal business expenditures. Key production and expansion benchmarks to be reached during Offering period is set forth below.

**Capitalization of $ 5,000,000**

| | |
|---|---|
| Settlement of Debt associated with Asset Purchases: | $ 1,000,000 |
| Install 15,000 ton devulcanization production line: | $ 1,000,000 |
| Working Capital | $ 3,000,000 |
| Further expansion of Plant 1, Plant 2 and establishment of other Plants | $20,000,000 |

## DETERMINATION OF OFFERING PRICE

Prior to this offering, there has been no market for the Units. The offering price for the Units was arbitrarily determined by the Company. This price is not based upon earnings or any history of operations. In determining the offering amount, we took into account the following factors: capital requirements of the planned expansion of processing operations using the Technology to devulcanize and reconstitute recycled rubber and general market conditions for the sale of securities.

## DESCRIPTION OF SECURITIES

### General

We are currently offering up to 100 Series A Royalty Units and 400 Series B Royalty Units under the terms of the Royalty Agreement and Certificate attached hereto as Exhibit A. We have no other Royalty Units outstanding as of the date of this Offering.

Holders of Royalty Certificates will have no equity in the Company, are not entitled to vote on Company matters, and will have no direct voice in the operations and management of the Company. Pursuant to the Royalty Agreement, holders of Royalty Certificates will be entitled to certain minimum guaranteed return annually and a percentage of overall gross revenues of the Company, as further described below.

All of the Units issued pursuant to this Offering will be validly issued, fully paid and non-assessable. The Company acts as its own transfer agent and registrar.

The Units are being offered under the following terms and conditions:

| | |
|---|---|
| Price: | $ 50,000 per Series A Royalty Unit |
| | $100,000 per Series B Royalty Unit |
| Maximum Number: | 100 Series A Units; 200 Series B Units |
| Minimum Annual Return: | 25 % annually for Series A; 12.5% annually for Series B |
| Collective Return: | For each $50,000 invested, the Series A Investor shall receive 0.01% of the Company's Gross Revenue as its Investor Royalty Percentage Interest. By way of example, if the revenue of the Company is $100 million per annum, each $50,000 Series A Royalty Percentage Unit shall receive a royalty payment of $10,000. The remainder of the minimum return of 25% (an additional $2,500) shall be paid following year end. |

20

CAPITAL0005374

For each $100,000 invested, the Series B Investor shall receive 0.01% of the Company's Gross Revenue as its Investor Royalty Percentage Interest. By way of example, if the revenue of the Company is $100 million per annum, each $100,000 Series B Royalty Percentage Unit shall receive a royalty payment of $10,000. The remainder of the minimum return of 12.5% (an additional $2,500) shall be paid following year end. Revenue receipts of the Company shall be paid by customers directly to a Trustee administered lock box bank account and debt service and royalty obligations shall be paid by the Trustee prior to distribution of the balance of receipts to the Company. The Trustee of the Revenue is a subsidiary of the Company, established for the sole purpose of serving as the holder and payor of Revenue of the Company. The Trustee is a Delaware limited liability company named EFG America Revenue Trust ("Trustee Company"). The managers of Trustee Company shall include at least one non insider of the Company.

|                             |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                        |
|-----------------------------|------------|
| Put and Call of Royalty Units: | Each Investor shall have the right on or after five (5) years following the closing of the Royalty Interest Offering to put to the Company their Royalty Interest. Upon providing the Put Notice to the Company, the Company shall pay to the Investor his original purchase price (amount invested) plus the present value of the average of the highest three years of return from the prior five year period, projected over the next five years with a discounted rate of return of 7% per annum. The Company shall be required to satisfy the Put purchase price within 90 days of receipt of the Put Notice. The Company shall have the right on or after ten (10) years following the closing of the Royalty Interest Offering to call the Royalty Interest and purchase the Royalty Interest from the Investor. Upon providing the Call Notice from the Company, the Company shall pay to the Investor his original purchase price (amount invested) plus the present value of the average of the highest three years of return from the prior five year period, projected over the next five years with a discounted rate of return of 5% per annum. The Company shall be required to satisfy the Call purchase price within 90 days of receipt of the Call Notice. See Exhibit A, Royalty Agreement and Certificate. |
| Security Interest of Royalty Holder | Each Investor shall hold a security interest in all of the assets of the Company on a para passu basis with all other units outstanding. The security interest is subordinate to other secured creditors but is superior to equity holders of the Company. The terms of the security interest is contained as an exhibit to the Royalty Agreement attached as Exhibit A. |

21

CAPITAL0005375

## LEGAL MATTERS

The validity of the Units offered with this Memorandum has been passed upon for the Company by the law firm Niehaus Wise & Kalas, Ltd.

## ADDITIONAL INFORMATION

During the course of the Offering, we will answer questions from offerees concerning the Company and the Offering. Any additional information which is necessary to verify the accuracy of the information contained in this Memorandum or otherwise furnished by us, or which an offeree desires in evaluating the merits and risks of investing in the Shares, will be provided, upon request, to the extent it is available to us without unreasonable effort or expense.

PROSPECTIVE INVESTORS SHOULD RETAIN THEIR OWN PROFESSIONAL ADVISORS TO REVIEW AND EVALUATE THE ECONOMIC, TAX, AND OTHER CONSEQUENCES OF OWNERSHIP OF THE SHARES. NEITHER THE CONTENTS OF THIS MEMORANDUM, NOR ANY OTHER INFORMATION FURNISHED BY THE COMPANY, SHOULD BE CONSTRUED AS INVESTMENT, LEGAL, ACCOUNTING OR TAX ADVICE.

CAPITAL0005376

**EXHIBIT A**


**ROYALTY AGREEMENT, CERTIFICATE
AND
SECURITY AGREEMENT**

CAPITAL0005377

# Royalty Agreement and Certificate

This agreement and certificate is entered into by and between EFG America, LLC (the "Company") on behalf of the Company and each of its Affiliates and the investors identified on Exhibit A attached hereto, as amended from time to time (each an "Investor"). This agreement provides for the payment of a royalty on revenue realized by the Company from the use of certain proprietary technology of the Company pursuant to the terms of each designated Investor Royalty Interest.

Whereas, the Company is a licensee of certain technology, which provides the know-how and intellectual property necessary to convert rubber products to a rubber material which can be used as a comparable substitute to virgin or synthetic rubber and which can be used in the manufacturing of rubber products exhibiting tensile strength. The license provides for a process commonly referred to in the rubber industry as Devulcanization.

Whereas, upon completion of the Devulcanization process, the output material from such process will be sold to manufacturers of rubber products and others.

Whereas, Investors shall be paid a royalty equal to the Investor's Royalty Percentage Interest applied to all revenue generated by the Company and its Affiliates from the use of the Devulcanization Process and other processes, materials and products produced by the Company, its Affiliates, its successors and assigns.

Now, therefore, in accordance with the premises above and for other good and valuable consideration, including the investment by Investors, the Company and each Investor agree as follows:

1. Capitalized terms used in this Agreement are defined on Appendix A, attached hereto.

2. Investor shall purchase from the Company his/its Investor Royalty Percentage Interest at the rate and subject to the terms provided on Exhibit A attached hereto. Upon the purchase by Investor, the Company shall pay in cash or immediately available funds to the Investor his/its Investor Royalty Payment (defined below) within thirty (30) days of each Calendar Quarter end. Each Investor's Royalty Payment is calculated by multiplying the Investor's Royalty Percentage Interest by the aggregate of all Revenue generated by the Company, any Affiliate of the Company utilizing or creating Revenue from the Process or derived previously from the Process and any successor or assigns of the Company utilizing the Process whether through license, ownership or other mean. For the avoidance of doubt, Revenue is defined as all monies and other valuables received by the Company from the sale of products. Revenue shall not include the proceeds from the sale of capital assets of the Company which are sold other than in the ordinary course of business. If the Investor Royalty Payment as calculated is less than the Minimum Annual Payment as calculated on a calendar year basis, then, for that Investor, the Company shall pay the Minimum Annual Payment to the Investor,

1

CAPITAL0005378

less any amount previously paid the Investor in such calendar year. For any year in which the Minimum Annual Payment is calculated is less than a full calendar year, the Minimum Annual Payment shall be prorated to a daily amount, using 365 day calendar year. The Investor Royalty Percentage Interest and the subscribed for Minimum Annual Payment (if any) shall be recorded on Exhibit A, and shall be displayed on the Certificate provided to the Investor. Revenue generated from the use of the Process shall include any Revenue generated in whole or in part from the Process.

3. Investor shall become a holder of an Investor Royalty Percentage Interest (also referred to as "IRPI") upon the occurrence of subscribing for such an interest pursuant to a subscription document which is accepted by the Company or through other means as may be determined by the board of directors of the Company. Each Investor shall execute a Joinder Agreement to this Agreement. The Company has created a subsidiary entity known as EFG America Revenue Trust, LLC, a Delaware limited liability company. The Company and EFG America Revenue Trust, LLC ("EFGART") have entered into an agreement the purpose of which is for all revenue generated by the Company and its affiliates in North America from the ordinary course of business shall be paid to an account of EFGART. EFGART shall independent of the Company segregate the IRPI for each Investor prior to payment of the net revenue to the Company. EFGART shall maintain a bank account for the benefit of all Investors and distribute payments to Investors on a minimum of a quarterly basis. The Company shall pay all expenses of EFGART, including banking, accounting, legal, indemnity of management and such other professional fees and expenses as are incurred from time to time by EFGART.

4. Put Option of Investor. The Investor shall have the right to put the Investor Percentage Royalty Interest back to the Company after the fifth anniversary of Investor's purchase of same. After the occurrence of the fifth anniversary of purchase, the Investor shall have the right to provide the Company notice of Investor's intent to sell the Investor Royalty Interest to the Company and upon receipt of such notice, the Company shall be obligated to make such purchase within ninety (90) days. The Company shall be obligated to make such purchase and failure to do so within such period of time shall be deemed a default. If default shall occur, then, in addition to the purchase price, the Company shall also pay a late fee equal to 25% per annum until paid in full. Payment may be made by EFGART out of revenue of the Company if not paid as required. The price for the purchase shall be calculated as the original investment made by the Investor, plus the present value of the IPRI calculated using the annual average of the three highest prior years of payments made by the Company to the Investor, and projecting such average annual payments over a five year period of time and using a discounted interest rate of 7% per annum to calculate its present value plus the initial purchase price paid by the Investor. Payment of the Put Purchase Price shall be made in cash within the discretion of the board of directors of the Company, or pursuant to a promissory note with an interest rate of 25% per

2

CAPITAL0005379

annum from the Company paid over a period of two years, or a combination of each. Notwithstanding the terms of the Put Right above, if the Company is deemed not to have the exclusive rights to the Process, the Investor shall have the right to exercise the Put Right at any time and the purchase price for the IPRI shall be calculated under the Call Option below.

5. Call Option of the Company. The Company shall have the right to call the Investor Percentage Royalty Interest after the tenth anniversary of Investor's purchase of same (the "Company Call"). After the occurrence of the tenth anniversary of purchase, the Company shall have the right to provide the Investor notice of the Company's intent to purchase certain IPRI which in the discretion of the Company may be applied to all Investors on a pro rata basis as applied to each Investor's IPRI. Upon receipt of such notice, each Investor agrees and shall be obligated to participate in such sale of their IPRI to the extent necessary to satisfy the Company Call. Each Investor hereby provides the Company with a power of attorney in fact to make the transfer of the IPRI from Investor to the Company and to execute all documents on behalf of the Investor to consummate such transfer immediately upon payment of the call option price. The Company shall be obligated to make such purchase within ninety (90) days. The price for the purchase shall be calculated as the present value of the IPRI calculated using the annual average of the three highest years of payments made by the Company to the Investor, and projecting such average annual payments over a five year period of time and using a discounted interest rate of 5% per annum to calculate the present value, plus the original amount paid by the Investor. Payment of the Call Purchase Price shall be made in cash.

6. Representations and Warranties of the Company. The Company represents to each Investor the following as of the date of this Agreement which shall survive for a period up to twelve months following the termination of an Investor's ownership of the IPRI:
   a. The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.
   b. The Company has ownership or exclusive rights to the intellectual property and know-how contained in the Process and such exclusive rights are geographically protected and exclusive to Company throughout North America which includes but is not limited to Mexico, United States of America, and Canada. As a licensee of the Process, the Company has obtained specific rights from the licensor of the Process to protect the interests of the Company and the Process.
   c. The Licensor is an entity controlled by the principal owners of the Company.
   d. The Company is in full compliance with all applicable laws and ordinances which currently governs its activities.
   e. The Company has the right to further license the Process. Any sub-license agreement for the Process from the Company shall be subject to the IPRI as to revenue generated by the sub-licensee as if the sub-licensee was a

3

CAPITAL0005380

party to this Agreement in the capacity of the Company. The Company shall require the sub-licensee to enter into a royalty agreement with Investor under terms materially similar to the economic terms of this Agreement for Investor except that no additional consideration shall be paid by Investor. The Company shall be responsible for the enforcement of such payments to Investors from the sub-licensee(s).

f.   The Company shall maintain its Books and Records in accordance with Generally Accepted Accounting Principles and shall provide the Trust with an audit of the Revenue subject to the IPRI on an annual basis or more frequently as may reasonably be requested by the Trust.

7. Term. The IPRI shall continue for so long as the Process is being utilized by the Company, its Affiliates, licensees, assignors and successors in interest and for so long as the IPRI remains outstanding.

8. Improvements to the Process. The Company and Investors acknowledge and agree that the Process contains proprietary knowledge, technology, formulas and other matters which may be improved upon from time to time. Any marginal or material improvement on the Process or any procedure which may be generated or discovered from the use of the Process shall also be subject to the IPRI and the terms of this Agreement. For absolute clarity, any improvement, synthesis, creation, basis of further process or other genesis of a process or improvement to same which was related to the Process shall also be governed by and subject to this Agreement and the IPRI.

9. Investor shall have no rights as an owner of the Process or an owner of the Company, other than as provided herein. Investor shall have no voting or other rights as if Investor were an owner of the Company. The Company and Investors are not partners, joint venturers, agents or other agency relationship by and between each such constituent party to this Agreement.

10. Company acknowledges and agrees that Investor shall have the right to assign its interest hereunder, subject to the assignee of such interest meeting the qualifications of an accredited investor as that terms is defined under the Securities Act of 1933, as amended and Regulation D thereunder. The Company may issue certificates for the IPRI which such certificate shall be subject to applicable legends regarding transferability.

11. The obligations of the Company to Investors are secured pursuant to a security agreement entered into by the Company and by execution of this agreement makes each Investor a party to same, para passu with all Investors. Upon Default, as defined herein, EFGART shall take all action necessary to enforce the terms of this Agreement, para passu with all Investors.

4

CAPITAL0005381

12. Default.  The Company, without notice or demand of any kind, shall be in default under this Agreement upon the occurrence of any of the following events (each an "Event of Default").

    a. <u>Nonpayment of Obligations.</u>  Any amount due and owing on any of the obligations hereunder, whether by its terms or as otherwise provided herein, is not paid when due and any interest due and owing on any obligation is not paid within five days after it is due.

    b. <u>Nonperformance.</u>  Any failure to perform or default in the performance of any covenant, condition or agreement contained in this Agreement, or in the other documents or any other agreement with other creditors and such failure to perform or default in the performance continues for 45 days.

    c. <u>Failure to Operate for an Extended Period of Time.</u>  At any time the Company fails to operate for a period of greater than six months, unless such failure to operate is due to regulatory or governmental restrictions, or due to a lack of materials, goods or other raw materials necessary for the operation of the business.

    d. <u>Bankruptcy, Insolvency, etc.</u>  The Company becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or the Company applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for the Company or any property thereof, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for the Company or for a substantial part of the property of any thereof and is not discharged within sixty (60) days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is commenced in respect of the Company, and if such case or proceeding is not commenced by the Company, it is consented to or acquiesced in by the Company, or remains undismissed for sixty (60) days; or the Company takes any action to authorize, or in furtherance of, any of the foregoing.

13. Governing Law.  This Agreement is to be construed under the laws of the State of Delaware without regard to conflicts of law principles that would require application of any other law.  The Company and each Investor agrees that the courts located in Mesa, Arizona shall be the sole venue and shall have sole jurisdiction for the resolution of all disputes arising hereunder.

14. Execution of Agreement, Counterparts and Joinder Agreement.  This Agreement may be executed in one or more counterparts, each of which is deemed an original copy of this Agreement an all of which, when taken together, are deemed to constitute one and the same Agreement.  The exchange of copies of this Agreement and of signature pages by facsimile transmission, pdf or other means of delivery of a recognized signature shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of original

CAPITAL0005382

signatures.  Any Investor not a party to the original Agreement may become a party through execution of a joinder agreement acceptable to the Company in form.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first above written.

**Company:**

**EFG America, LLC**, a Delaware limited liability company


By:_____
D. Elroy Fimrite
President

6

CAPITAL0005383

Investors: Execution by Investors is made pursuant to a Joinder Agreement in the following form:

## JOINDER AGREEMENT

### ADDENDUM TO THE
### Royalty Agreement and Certificate

### ADDITIONAL INVESTOR SIGNATURE PAGE

**IN WITNESS WHEREOF**, pursuant to the Royalty Agreement and Certificate dated on or about December 9, 2014, in consideration of and as a condition to the undersigned's acquiring an Investor Royalty Percentage Interest, the undersigned hereby executes and enters into this Addendum to the Royalty Agreement and Certificate as an additional Investor, as of the effective date of the undersigned's acquisition of the Investor Royalty Percentage Interest as that term is defined under the Royalty Agreement and Certificate.

By execution of this signature page and on such effective date, the undersigned becomes a party to the Royalty Agreement and Certificate and agrees to be bound in all respects by the terms and conditions of this Royalty Agreement and Certificate on such effective date.

Date Signed:_____

_____
Signature

_____
Print Name

7

CAPITAL0005384

**Exhibit A: Investor Royalty Percentage Interest**

<u>Investors Up to $5 million:  $50,000 per unit of Series A Royalty Units.</u>

The Company is selling Investor Royalty Percentage Interests initially in Series A Royalty Units of $50,000 up to an aggregate of $5 million.  The Company shall pay to the holders of one Series A Investor Royalty Percentage Interests a royalty as defined under the Royalty Agreement and Certificate in the aggregate amount equal to 0.01% of all Revenue; if such amount paid does not equal 25% per annum rate of return to the Investor, the Company shall pay such remaining amount necessary to equal 25% per annum following the calendar year end.

<u>Investors Up to $5 million:  $100,000 per unit of Series B Royalty Units.</u>

The Company is selling Investor Royalty Percentage Interests initially in Series B Royalty Units of $50,000 up to an aggregate of $20 million.  The Company shall pay to the holders of one Series B Investor Royalty Percentage Interests a royalty as defined under the Royalty Agreement and Certificate in the aggregate amount equal to 0.01% of all Revenue; if such amount paid does not equal 12.5% per annum rate of return to the Investor, the Company shall pay such remaining amount necessary to equal 12.5% per annum following the calendar year end.

CAPITAL0005385

Investors subscribing for the units and having executed a joinder agreement and their Investor Royalty Percentage Interests and Minimum Annual Return are as follows:

| Investor and Purchase Price per Unit | Percentage Interest per Unit | Number of Unit | Investor Royalty Percentage Interest | Minimum Rate of Return on Investment |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CAPITAL0005386

## Exhibit B: DEFINED TERMS (not otherwise defined above)

*Affiliate* means with respect to any Person, any Person which, directly or indirectly, controls, is controlled by, or is under a common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") as used in this definition means the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. With respect to any natural person, the term "*Affiliate*" shall also mean (1) the spouse or children (including those by adoption) and siblings of such Person; and any trust whose primary beneficiary is such Person, such Person's spouse, such Person's siblings and/or one or more of such Person's lineal descendants, (2) the legal representative or guardian of such Person or of any such immediate family member in the event such Person or any such immediate family member becomes mentally incompetent and (3) any Person controlled by or under the common control with any one or more of such Person and the Persons described in clauses (1) or (2) preceding.

*Agreement* has the meaning set forth in the introductory paragraph.

*Books and Records means* all books and records pertaining to the Purchased Assets, including, but not limited to, all books of account, journals and ledgers, files, correspondence, memoranda, maps, plats, catalogs, promotional materials, data processing programs and other computer software, building and machinery diagrams and plans.

CAPITAL0005387

**Exhibit C: Revenue Royalty Certificate**

CAPITAL0005388



# EFG AMERICA, LLC

## REVENUE ROYALTY CERTIFICATE

The Holder of this Certificate is _____ and is entitled to _____% of revenue paid as a royalty pursuant to and in accordance with the Royalty Agreement and Certificate dated December _____, 2014. The terms of the Royalty Agreement Guaranty control this certificate.

_____

D. ELROY FIMRITE, PRESDIENT

CAPITAL0005389

**Exhibit D: Security Agreement**

This SECURITY AGREEMENT, dated as of December 9, 2014 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), made by and among EFG America, LLC, a Delaware Limited Liability Company and each of its Affiliates (the "**Grantor**"), in favor of each of the Investors defined under certain Royalty Agreements and Certificates on a para passu basis, (the **"Secured Party" or "Secured Parties"**).

WHEREAS, on the date hereof, the Secured Parties have made certain investments in the Company which creates obligations of the Company to pay each of the Secured Parties pursuant to the terms of a Royalty Agreement (the "Royalty Agreement"); such Secured Parties may be added or extended from time to time pursuant to the Royalty Agreements. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Royalty Agreements;

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Parties to secure the payment and performance of all of the obligations under the Royalty Agreements; and

WHEREAS, it is a condition to the obligations of the Investors to make the investment in the Royalty Agreements that the Grantor execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Definitions.

Unless otherwise specified herein, all references to Sections are to Sections of this Agreement.

Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

For purposes of this Agreement, the following terms shall have the following meanings:

**"Affiliate"** means with respect to any Person, any Person which, directly or indirectly, controls, is controlled by, or is under a common control with, such Person.

13

CAPITAL0005390

The term "control" (including the terms "controlled by" and "under common control with") as used in this definition means the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  With respect to any natural person, the term "*Affiliate*" shall also mean (1) the spouse or children (including those by adoption) and siblings of such Person; and any trust whose primary beneficiary is such Person, such Person's spouse, such Person's siblings and/or one or more of such Person's lineal descendants, (2) the legal representative or guardian of such Person or of any such immediate family member in the event such Person or any such immediate family member becomes mentally incompetent and (3) any Person controlled by or under the common control with any one or more of such Person and the Persons described in clauses (1) or (2) preceding.

"**Collateral**" has the meaning set forth in *Section* **0**.

"**Event of Default**" has the meaning set forth in the Royalty Agreement.

"**Perfection Certificate**" has the meaning set forth in *Section* **0**.

"**Proceeds**" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.

"**Secured Obligations**" has the meaning set forth in *Section* **0**.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Delaware or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing lien and security interest (the "**Junior Security Interest**") in favor of the Secured Party in and to all of its right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"); provided however that Secured Party's Junior Security Interest is and always shall be subordinate to all other existing and future secured obligations owed by Grantor.

all Assets of the Grantor of every kind and nature including but not limited to all real property, personal property, accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money; and

CAPITAL0005391

all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

<u>Secured Obligations</u>. The Collateral secures the due and prompt payment and performance of:

the obligations of the Grantor from time to time arising under the Royalty Agreement, this Agreement or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the Loans (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the Royalty Agreement and this Agreement; and

all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the Royalty Agreement, this Agreement or any other document made, delivered or given in connection with any of the foregoing, in each case, whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in **Section 0** being herein collectively called the "**Secured Obligations**").

<u>Perfection of Security Interest and Further Assurances</u>.

The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, immediately take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, section 201 of the federal Electronic Signatures in Global and National Commerce Act and, as the case may be, section 16 of the Uniform Electronic Transactions Act, as

15

CAPITAL0005392

applicable, the Grantor shall take all actions as may be requested from time to time by the Secured Party so that control of such Collateral is obtained and at all times held by the Secured Party. All of the foregoing shall be at the sole cost and expense of the Grantor.

The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section promptly to the Secured Party upon request.

The Grantor hereby further authorizes the Secured Party to file with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any state of the United States or in any other country) this Agreement and other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

If the Grantor shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents or warehouse receipts relating to the Collateral, the Grantor shall immediately endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to perfect and protect any security interest granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

16

CAPITAL0005393

<u>Representations and Warranties</u>. The Grantor represents and warrants as follows:

It has previously delivered to the Secured Party a certificate signed by the Grantor and entitled "Perfection Certificate" ("**Perfection Certificate**"), and that: (i) the Grantor's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof, (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the Perfection Certificate, (iii) the Perfection Certificate accurately sets forth the Grantor's organizational identification number (or accurately states that the Grantor has none), the Grantor's place of business (or, if more than one, its chief executive office), and its mailing address, (iv) all other information set forth on the Perfection Certificate relating to the Grantor is accurate and complete and (v) there has been no change in any such information since the date on which the Perfection Certificate was signed by the Grantor.

All information set forth on the Perfection Certificate relating to the Collateral is accurate and complete and there has been no change in any such information since the date on which the Perfection Certificate was signed by the Grantor.

At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the Royalty Agreement.

The pledge of the Collateral pursuant to this Agreement creates a valid and perfected Junior Security Interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

It has full power, authority and legal right to borrow the Loans and pledge the Collateral pursuant to this Agreement.

Each of this Agreement and the Royalty Agreement has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Loans and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the Royalty Agreement and this Agreement by the Grantor or the performance by the Grantor of its obligations thereunder.

CAPITAL0005394

The execution and delivery of the Royalty Agreement and this Agreement by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

<u>Voting, Distributions and Receivables</u>.

The Secured Party agrees that unless an Event of Default shall have occurred and be continuing, the Grantor may, to the extent the Grantor has such right as a holder of the Collateral consisting of securities, other Equity Interests or indebtedness owed by any obligor, vote and give consents, ratifications and waivers with respect thereto, except to the extent that, in the Secured Party's reasonable judgment, any such vote, consent, ratification or waiver could detract from the value thereof as Collateral or which could be inconsistent with or result in any violation of any provision of the Royalty Agreement or this Agreement, and from time to time, upon request from the Grantor, the Secured Party shall deliver to the Grantor suitable proxies so that the Grantor may cast such votes, consents, ratifications and waivers.

If any Event of Default shall have occurred and be continuing the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

<u>Covenants</u>. The Grantor covenants as follows:

The Grantor will not, without providing at least 30 days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

CAPITAL0005395

The Collateral, to the extent not delivered to the Secured Party pursuant to **Section 0**, will be kept at those locations listed on the Perfection Certificate and the Grantor will not remove the Collateral from such locations without providing at least 30 days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

The Grantor shall, at its own cost and expense, defend title to the Collateral and the Junior Security Interest lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected Junior Security Interest for so long as this Agreement shall remain in effect.

The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the Royalty Agreement/herein or with the prior written consent of the Secured Party.

The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located.

The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

<u>Secured Party Appointed Attorney-in-Fact</u>. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

<u>Secured Party May Perform</u>. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall

CAPITAL0005396

be payable by the Grantor; *provided that* the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

<u>Reasonable Care</u>. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

<u>Remedies Upon Default</u>. If any Event of Default shall have occurred and be continuing:

The Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in **Section 0** hereof ten days prior to the date of such disposition shall constitute reasonable notice, but notice given in any other reasonable manner shall be sufficient. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands it may acquire against the Secured Party arising

20

CAPITAL0005397

out of the exercise by it of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

Any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

<u>No Waiver and Cumulative Remedies</u>. The Secured Party shall not by any act (except by a written instrument pursuant to **Section 0**), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

<u>Security Interest Absolute</u>. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder,

21

CAPITAL0005398

and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument;

any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the Royalty Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Secured Obligations;

any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations;

any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loans or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

Addresses For Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the Royalty Agreement, and addressed to the respective parties at their addresses as specified on the signature pages hereof or as to either party at such other address as shall be designated by such party in a written notice to each other party.

22

CAPITAL0005399

<u>Continuing Security Interest; Further Actions</u>. This Agreement shall create a continuing lien and Junior Security Interest in the Collateral and shall (a) subject to **Section 0**, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; *provided that* the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party.  Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

<u>Termination; Release</u>. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

<u>Governing Law</u>. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Delaware.

<u>Counterparts</u>. This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the Royalty Agreement constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

SIGNATURE PAGE FOLLOWS

23

CAPITAL0005400

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**Grantor**: EFG America, LLC

By_____

Name: Elroy Fimrite
Title: Chief Executive Officer
Address for Notices:
1045 E. Mackellips Road
Mesa, Arizona 85203

**Secured Party**:

_____

Name:

Address for Notices:

24

CAPITAL0005401

**EXHIBIT B**

**SUBSCRIPTION AGREEMENT FOR INDIVIDUALS**

CAPITAL0005402

# EFG AMERICA, LLC

## SUBSCRIPTION AGREEMENT

THE SECURITIES OFFERED BY EFG AMERICA, LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND ARE SOLD IN RELIANCE UPON THE EXEMPTION PROVIDED IN SECTION 4(2) OF SAID ACT AND RULE 506 OF THE PROVISIONS OF REGULATION D PROMULGATED THEREUNDER. THE SECURITIES CANNOT BE SOLD, TRANSFERRED, ASSIGNED, OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH APPLICABLE FEDERAL AND STATE SECURITIES LAWS.

1.    *Subscription.*

(a)    Subject to the terms and conditions of this Agreement and the provisions hereof, including defined terms contained in the Private Placement Memorandum dated December 9, 2014 (said Private Placement Memorandum, including all exhibits, and schedules contained therein or attached thereto, and any amendments and supplements thereto, being hereinafter referred to collectively as the "Memorandum"), the Undersigned hereby irrevocably subscribes for and agrees to purchase at a price of $_____0,000 per Unit _____ Series ____ Royalty Units (the "Securities") of EFG America, LLC, a Delaware limited liability company (the "Company"). The Undersigned is delivering to the Company herewith (i) the Undersigned's wire transfer, electronic payment, or other paperless transaction information, cashier's check, money order, or check (collectively the "Payment"), for the account of, or payable to the order of "Niehaus Wise & Kalas, Ltd., Escrow Agent" in the amount of $_____, representing the aggregate purchase price of the Securities, and (ii) and this completed and duly executed investor questionnaire, in the form contained in this subscription booklet. If the Payment is provided by wire transfer, it should be sent to the following account:

> Niehaus Wise & Kalas, Ltd. IOLTA
> Account No. 2016145
> Routing No. 041215621
> Swift Code: SIGTUS31
> Signature Bank, N.A.
> 4607 W. Sylvania Ave.
> Toledo, OH 43623
> (419) 841-7773

(b)    The Undersigned understands that the aforementioned Payment will be held in escrow pursuant to an Escrow Agreement entered into by the Company and Niehaus Wise & Kalas, Ltd. ("Escrow Agent"). Pursuant to the terms of the Memorandum, the proceeds from the sale of the Securities to the Undersigned shall be released upon acceptance of the subscription of the Undersigned. The Undersigned understands that if and

CAPITAL0005403

to the extent this subscription is not accepted, in whole or in part, any amount so received will be returned to the Undersigned, including the Undersigned's pro rata share of any income earned on the funds while in the escrow account.

2.     *Acceptance of Subscription.*   The Undersigned acknowledges that the Company reserves the right, in its sole discretion, to accept or reject this subscription, in whole or in part, and that this subscription shall not be binding unless and until accepted by the Company.  The Undersigned agrees that subscriptions need not be accepted in the order that they are received.

3.     *Representations and Warranties.*   The Undersigned hereby represents and warrants to the Company as follows:

(a)     The Undersigned has received and carefully read the Memorandum. The Undersigned recognizes that the Company has a limited financial and operating history and that an investment in the Company involves significant risks, including those set forth under the caption "Risk Factors" in the Memorandum.

(b)     The information contained in the Undersigned's investor questionnaire is true and complete.

(c)     The Undersigned and his/her purchaser representative(s), if any, have been furnished any materials relating to the Company, its business and financial condition, the Offering, and any other matter set forth in the Memorandum which they have requested, and have been afforded the opportunity to ask questions and receive answers concerning the terms and conditions of the Offering and to obtain any additional information which the Company possesses or can acquire without unreasonable effort or expense that is necessary to verify the accuracy of the information set forth in the Memorandum.

(d)     The Company has answered all inquiries that the Undersigned and his/her purchaser representative(s), if any, have made of it concerning the Company, its business and financial condition, or any other matter relating to the operation of the Company and the Offering.  No oral or written statement or inducement which is contrary to the information set forth in the Memorandum has been made by or on behalf of the Company to the Undersigned or his/her purchaser representative(s), if any.

(e)     The Undersigned is an "accredited investor" (as defined in Rule 501 of Regulation D) and the Undersigned meets one of the following suitability standards (check *each* appropriate box):

(i)          He/She has an individual net worth, or he/she and his/her spouse have a joint net worth, in excess of $1,000,000 excluding primary residence;

(ii)          He/She had individual income in excess of $200,000 in each of the two most recent years, or joint income with his/her spouse in excess of

$300,000 in each of those years, and expects to reach the same income level in the current year;

(iii)            He/She is a manager or executive officer of the Company;

(iv)            He/She is a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934;

(f)      The Undersigned (i) has adequate means of providing for his/her current needs and possible personal contingencies, (ii) has no need for liquidity in this investment, (iii) is able to bear the economic risks of his/her investment in the Securities, and (iv) at the present time, can afford a complete loss of such investment.

(g)      The Undersigned is purchasing the Securities for his/her own account for investment, and not for distribution, assignment or resale to others, and no other person has any direct or indirect beneficial interest in such Securities.

(h)      The Undersigned understands that (i) there is and will be no market for the Securities; (ii) the sale of the Securities has not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act") in reliance on the exemption for non-public offerings provided by Section 4(2) of the Securities Act and Regulation D promulgated thereunder and must be held indefinitely unless the Securities are subsequently registered under the Securities Act or an exemption from such registration is available; (iii) the Company is under no obligation to register the Securities on his/her behalf or to assist him/her in complying with any exemption from registration; and (iv) the Securities may not be sold pursuant to Rule 144 promulgated by the Securities and Exchange Commission pursuant to the Securities Act unless all of the conditions of that Rule are met.

(i)      The Undersigned understands that no federal or state agency has passed upon the Securities, or made any finding or determination as to the fairness of the investment or any recommendation or endorsement of the Securities. The Undersigned understands that the Memorandum may not have been filed with or reviewed by certain state securities administrators because of representations made by the Company as to the private or limited nature of the Offering. The Undersigned will not transfer the Securities without registering or qualifying the same under applicable state securities laws unless such transfer is exempt under such laws.

(j)      Neither the Undersigned nor his/her purchaser representative(s), if any, have been furnished any offering literature other than the Memorandum and other materials which the Company may have provided at the request of the Undersigned or his/her purchaser representative(s), if any, and the Undersigned and his/her purchaser representative(s), if any, have relied only on the information contained in the Memorandum and the information furnished or made available to the Undersigned and his/her purchaser representative(s), if any, by the Company, as described in subparagraphs (c) and (d) above.

CAPITAL0005405

(k)     The Undersigned has not distributed the Memorandum to any person other than his/her purchaser representative(s), if any, and no person other than the Undersigned and his/her purchaser representative(s), if any, have used the Memorandum.

(l)     The Undersigned is a citizen of the United States of America, is at least 21 years of age, and has the legal capacity to execute, deliver, and perform this Agreement.

(m)     All information which the Undersigned has provided to the Company concerning himself/herself, his/her financial position, and his/her knowledge of financial and business matters, including all information contained herein, including the individual investor questionnaire, is true and complete as of the date set forth at the end hereof, and if there should be any adverse change in such information prior to this subscription being accepted, the Undersigned will immediately provide the Company with accurate and complete information concerning any such change.

(n)     The Undersigned certifies, under penalties of perjury, (i) that the social security number shown on the signature page of this Agreement is true and complete, and (ii) that the Undersigned is not subject to backup withholding either because the Undersigned has not been notified that he/she is subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified the Undersigned that he/she is no longer subject to backup withholding.

4.     *Indemnification*.  The Undersigned agrees to indemnify and hold harmless the Company, its officers, directors, employees, members and affiliates, and any person acting on behalf of the Company, from and against any and all damage, loss, liability, cost, and expense (including attorney fees) which any of them may incur by reason of the failure by the Undersigned to fulfill any of the terms or conditions of this Agreement, or by reason of any breach of the representations and warranties made by the Undersigned herein, in the Undersigned's investor questionnaire, or in any other document provided by the Undersigned to the Company.  All representations, warranties and covenants contained in this Agreement, and the indemnification contained in this paragraph 4, shall survive the acceptance of this subscription.

5.     *Compliance with Section 4(2)*.  The Undersigned understands and agrees that the following restrictions and limitations are applicable to his/her purchase of the Securities which are being sold to him/her in reliance on the exemption from registration contained in Section 4(2) of the Securities Act:

(a)     The Securities may not be sold, pledged, hypothecated or otherwise transferred unless they are registered under the Securities Act and applicable state securities laws or are exempt therefrom.

(b)     A legend to the following effect will be placed on any certificates representing the Securities:

CAPITAL0005406

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, OR HYPOTHECATED IN THE ABSENCE OF ANY EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL (WHICH MAY BE COUNSEL TO THE COMPANY) SATISFACTORY TO THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQURIED."

(c)     Stop transfer instructions to the transfer agent, if any, of the Securities have been or will be placed with respect to the Securities so as to restrict resale, pledge, hypothecation or other transfer thereof, subject to the provisions hereof, including the provisions of the legend referred to in subparagraph (b) above.

6.     *No Waiver.*    Notwithstanding any of the representations, warranties, acknowledgments, or agreements made herein by the Undersigned, the Undersigned does not thereby or in any other manner waive any of the rights granted to him/her under federal or state securities laws.

7.     *Entire Agreement; Modification.*    This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and neither this Agreement nor any provisions hereof shall be waived, changed, discharged, or terminated except by an instrument in writing signed by the party against whom any waiver, change, discharge, or termination is sought.

8.     *Notices.*    Any notice, demand, or other communication which any party hereto may be required, or may elect, to give to anyone interested hereunder shall be sufficiently given if (a) deposited, postage prepaid, in the United States mail, registered or certified mail, addressed to:  in the case of the Company, EFG America, LLC, c/o Niehaus Wise & Kalas, Ltd., 7150 Granite Circle, Toledo, Ohio 43617, and in the case of the Undersigned at the address set forth on the signature page hereof or at such other address as the Undersigned shall so notify pursuant hereto, or (b) delivered personally at such address.

9.     *Binding Effect.*    Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and assigns.  If the Undersigned is more than one person, the obligations of the Undersigned shall be joint and several and the agreements, representations, warranties, and acknowledgments herein contained shall be deemed to be made by and be binding upon each such person and his/her respective heirs, executors, administrators, successors, legal representatives, and assigns.

10.     *Assignability.*    The Undersigned agrees not to transfer or assign this

CAPITAL0005407

Agreement, or any of the Undersigned's interest herein.

11.    *Applicable Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the choice of law provisions thereof.

12.    *Form of Ownership.* Please indicate form of ownership desired:

_____ Individual
_____ Joint tenants with right of survivorship
_____ Tenants in common
_____ Community property
_____ IRA
_____ Other (specify) _____

13.    *Titling of Royalty Certificate.* Please indicate how the Units should be titled/registered:

_____
_____
_____
_____

\*        \*        \*

IN WITNESS WHEREOF, the Undersigned has executed this Agreement on the _____ day of _____, 2014.

INDIVIDUAL(S) SIGN HERE

_____          _____
Signature                                                              Signature (if Joint)


_____          _____
Social Security Number                                     Social Security Number


_____          _____
Printed Name                                                     Printed Name

CAPITAL0005409

## JOINDER AGREEMENT

### ADDENDUM TO THE
### Royalty Agreement and Certificate

### ADDITIONAL INVESTOR SIGNATURE PAGE

**IN WITNESS WHEREOF**, pursuant to the Royalty Agreement and Certificate dated on or about December 9, 2014, in consideration of and as a condition to the undersigned's acquiring an Investor Royalty Percentage Interest, the undersigned hereby executes and enters into this Addendum to the Royalty Agreement and Certificate as an additional Investor, as of the effective date of the undersigned's acquisition of the Investor Royalty Percentage Interest as that term is defined under the Royalty Agreement and Certificate.

By execution of this signature page and on such effective date, the undersigned becomes a party to the Royalty Agreement and Certificate and agrees to be bound in all respects by the terms and conditions of this Royalty Agreement and Certificate on such effective date.

Date Signed:_____

_____
Signature

_____
Print Name

CAPITAL0005410

## <u>Acceptance of Subscription Agreement</u>

The undersigned, on behalf of EFG AMERICA, LLC, herenow accepts this Subscription Agreement in reliance upon the terms contained herein and in reliance upon the representations made by the above subscriber.  This Subscription Agreement is accepted and became binding upon the Company on the date of execution of the Company as indicated below.

Date:_____   EFG America, LLC

          By:_____

          Its:_____

CAPITAL0005411

**EXHIBIT C**

**SUBSCRIPTION BOOKLET FOR ENTITIES**

CAPITAL0005412

*Subscription Booklet for Entity Investor*

# EFG AMERICA, LLC

### SUBSCRIPTION BOOKLET

Instructions to Entity Investors
Entity Investor Questionnaire
Subscription Agreement

CAPITAL0005413

# INSTRUCTIONS TO ENTITY INVESTORS

This Subscription Booklet is provided to you by EFG America, LLC, a Delaware limited liability company (the "Company"), for the purpose of obtaining information about you, the Investor, and to further provide you with a Subscription Agreement for the purpose of purchasing securities of the Company.

AFTER YOU HAVE CAREFULLY REVIEWED THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND DECIDED TO SUBSCRIBE FOR AND PURCHASE SECURITIES OF THE COMPANY, PLEASE OBSERVE THE FOLLOWING INSTRUCTIONS:

**Purchase Procedure**

**Item A.    Entity Investor Questionnaire**

Included in this Subscription Booklet is an Entity Investor Questionnaire. Complete the questionnaire in full and sign and date the questionnaire.

The purpose of the Entity Investor Questionnaire is to provide information as to the suitability of potential Investors pursuant to the requirements of Section 4(2) of the Securities Act of 1933 (the "Act") and Rule 506 of Regulation D promulgated thereunder and applicable state securities laws. It is understood that the information provided is confidential and will not be reviewed by anyone other than the Company and its counsel and consultants. Any purchaser may be required to furnish additional information in connection with any proposed purchase.

**Item B.    Declaration of Purchaser Representative and Disclosure by Purchaser Representative and Acknowledgment by Investor**

These documents will be provided to the Investor by the Company upon request.

**Item C.    Subscription Agreement**

Read the Subscription Agreement in its entirety and make the representations contained therein and agree to its terms by executing and dating the signature page and providing the additional information required.

Please deliver the completed subscription documents in their entirety to EFG America, LLC, c/o Niehaus Wise & Kalas, Ltd., Escrow Agent, at 7150 Granite Circle, Suite 203, Toledo, Ohio 43617. In connection with the delivery of the subscription documents, wire transfer information, a cashier's check, money order, other electronic form of payment, or a check, made payable to "Niehaus Wise & Kalas, Ltd., Escrow Agent" must be delivered to the Escrow Agent. If by wire transfer, funds should be directed to:

Niehaus Wise & Kalas, Ltd. IOLTA
Account No. 2016145
Routing No. 041215621
Swift Code:  SIGTUS31
Signature Bank, N.A.
4607 W. Sylvania Ave.
Toledo, OH 43623
(419) 841-7773

ALL INFORMATION SUPPLIED IN THE SUBSCRIPTION DOCUMENTS SHOULD
BE TYPED OR PRINTED IN INK.

CAPITAL0005415

**EFG America, LLC**

**CONFIDENTIAL ENTITY INVESTOR QUESTIONNAIRE**

EFG America, LLC
c/o Niehaus Wise & Kalas, Ltd.
7150 Granite Circle, Suite 203
Toledo, Ohio 43617

To whom it may concern:

The following information is furnished to you in order for you to determine whether the Undersigned will be a qualified purchaser of Securities (the "Securities") of EFG America, LLC, a Delaware limited liability company (the "Company"), pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "Act"), and Regulation D promulgated thereunder ("Regulation D"). I understand that you will rely upon the following information for purposes of such determination and that the Securities will not be registered under the Act in reliance upon the exemption from registration provided by Section 4(2) of the Act and Regulation D.

ALL INFORMATION CONTAINED IN THIS QUESTIONNAIRE WILL BE TREATED CONFIDENTIALLY. However, I understand and agree that you may disclose this Questionnaire to such parties as you deem appropriate if called upon to establish that the proposed offer and sale of the Securities is exempt from registration under the Act or meets the requirements of applicable state securities laws.

The Undersigned understands that this Questionnaire is merely a request for information and is not an offer to sell or a solicitation of an offer to buy or a sale of the Securities and that no sale will occur prior to the acceptance of the Undersigned's subscription by the Company. The Undersigned also understands that it may be required to furnish additional information.

_____
Printed Name of Entity

By:_____

_____
Printed Name and Title

CAPITAL0005416

*Entity Questionnaire*

**CONFIDENTIAL**

1.　　Name of Purchaser _____

2.　　Mailing Address_____

_____

3.　　Federal Identification Number of Purchaser_____

4.　　Type of entity (please check appropriate box):

　　　a.　　　　corporation

　　　b.　　　　partnership

　　　c.　　　　limited liability company

　　　d.　　　　trust

　　　e.　　　　bank or savings and loan association

　　　f.　　　　broker or dealer

　　　g.　　　　insurance company

　　　h.　　　　investment company registered under the Investment Company Act of 1940 or a business development company as defined in that Act

　　　i.　　　　small business investment company licensed by the U.S. Small Business Administration

　　　j.　　　　plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees ("Government Employee Plan")

　　　k.　　　　organization described in Section 501(c)(3) of the Internal Revenue Code ("Charitable Organization")

　　　l.　　　　employee benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA Plan")

　　　m.　　　　other (please describe):_____

5.   If Purchaser is a **corporation, partnership, limited liability company, trust or charitable organization**, please answer the following questions:

    a.   Was such entity formed for the specific purpose of acquiring the Securities?

              Yes          No

    b.   If the answer to question 5(a) above is "Yes", please list below the names and addresses of the holders of all beneficial interests of such entity:

_____

_____

_____

_____

_____

_____

6.   If Purchaser is a **corporation, partnership, limited liability company, trust, Government Employee Plan, Charitable Organization, or ERISA Plan**, does such entity possess total assets in excess of $5,000,000?

              Yes          No

7.   If Purchaser is an **ERISA Plan**, please answer the following questions:

    a.   Has the decision to purchase the Securities been made by a plan fiduciary which is either a bank, savings and loan association, insurance company, or a registered investment advisor?

              Yes          No

    b.   Is the ERISA Plan a "self-directed" plan?

              Yes          No

CAPITAL0005418

*Entity Questionnaire*

    c.    If the ERISA Plan is a "self-directed" plan, are investment decisions made solely by (please check one or both of the following statements):

        i.    a natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000; and/or

        ii.    a natural person who had an individual income in excess of $200,000 in each of the two most recent years, or joint income with that person's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

8.    State of organization of entity _____

9.    Date of organization of entity _____


    I represent that to the best of my knowledge and belief, the above information supplied by me is true and correct in all respects, and I am aware and intend that the Company may rely upon such information to determine the entity's suitability as an Investor in the Securities of the Company.


Date:_____, 2014.        _____

                                        Printed Name of Entity

                                        By:_____

                                        _____

                                        Printed Name and Title


**EXECUTION OF THIS DOCUMENT ALONE DOES NOT BIND THE INVESTOR TO PURCHASE SECURITIES OF THE COMPANY.**

CAPITAL0005419

**EFG America, LLC**

**SUBSCRIPTION AGREEMENT**

THE SECURITIES OFFERED BY EFG AMERICA, LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND ARE SOLD IN RELIANCE UPON THE EXEMPTION PROVIDED IN SECTION 4(2) OF SAID ACT AND RULE 506 OF THE PROVISIONS OF REGULATION D PROMULGATED THEREUNDER. THE SECURITIES CANNOT BE SOLD, TRANSFERRED, ASSIGNED, OR OTHERWISE DISPOSED OF EXCEPT IN COMPLIANCE WITH APPLICABLE FEDERAL AND STATE SECURITIES LAWS.

     1.    *Subscription.*

    (a)    Subject to the terms and conditions of this Agreement and the provisions hereof, including defined terms contained in the Private Placement Memorandum dated September 1, 2014 (said Private Placement Memorandum, including all exhibits, and schedules contained therein or attached thereto, and any amendments and supplements thereto, being hereinafter referred to collectively as the "Memorandum"), the Undersigned hereby irrevocably subscribes for and agrees to purchase at a price of $_____0,000 per Unit, _____ Series ___ Units (the "Securities") of EFG America, LLC, a Delaware limited liability company (the "Company"). The Undersigned is delivering to the Company herewith (i) the Undersigned's wire transfer, electronic payment, or other paperless transaction information, cashier's check, money order, or check (collectively, the "Payment"), for the account of, or payable to the order of "Niehaus Wise & Kalas, Ltd., Escrow Agent" in the amount of $_____, representing the aggregate purchase price of the Securities, and (ii) a completed and duly executed Investor Questionnaire, in the form contained in the Subscription Booklet. If the Payment is provided by wire transfer, it should be sent to the following account:

        Niehaus Wise & Kalas, Ltd. IOLTA
        Account No. 2016145
        Routing No. 041215621
        Swift Code: SIGTUS31
        Signature Bank, N.A.
        4607 W. Sylvania Ave.
        Toledo, OH 43623
        (419) 841-7773

    (b)    The Undersigned understands that the aforementioned Payment will be held in escrow pursuant to an Escrow Agreement entered into by the Company and Niehaus Wise & Kalas, Ltd ("Escrow Agent"). Such Escrow Agreement provides, consistent with the Memorandum, that the proceeds of the offering of securities are available for release immediately at the discretion of the Company. The Undersigned understands that if and to the extent this subscription is not accepted, in whole or in part,

CAPITAL0005420

any amount so received will be returned to the Undersigned.

2. *Acceptance of Subscription*. The Undersigned acknowledges that the Company reserves the right, in its sole discretion, to accept or reject this subscription, in whole or in part, and that this subscription shall not be binding unless and until accepted by the Company. The Undersigned agrees that subscriptions need not be accepted in the order that they are received.

3. *Representations and Warranties*. The Undersigned hereby represents and warrants to the Company as follows:

(a) The Undersigned has received and carefully read the Memorandum. The Undersigned recognizes that the Company has a limited financial and operating history and that an investment in the Company involves significant risks, including those set forth under the caption "Risk Factors" in the Memorandum.

(b) The information contained in the Undersigned's Investor Questionnaire is true and complete.

(c) The Undersigned has been furnished any materials relating to the Company, its business and financial condition, the Offering, and any other matter set forth in the Memorandum which they have requested, and have been afforded the opportunity to ask questions and receive answers concerning the terms and conditions of the Offering and to obtain any additional information which the Company possesses or can acquire without reasonable effort or expense that is necessary to verify the accuracy of the information set forth in the Memorandum.

(d) The Company has answered all inquiries that the Undersigned has made of it concerning the Company, its business and financial condition, or any other matter relating to the operation of the Company and the Offering. No oral or written statement or inducement which is contrary to the information set forth in the Memorandum has been made by or on behalf of the Company to the Undersigned.

(e) The Undersigned is an "accredited investor" (as defined in Rule 501 of Regulation D) and the Undersigned meets one of the following suitability standards (check *each* appropriate box):

(i) It is a corporation, business trust or partnership not formed for the specific purpose of acquiring the Securities, with total assets of greater than $5,000,000;

(ii) It is an entity in which all of the equity owners are accredited investors;

(iii) It is a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Securities, whose purchase is directed by a sophisticated person who has such knowledge and

experience in financial and business matters that he/she is capable of evaluating the merits and risks of an investment in the Securities;

        (iv)       It is an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 and either    (a)      the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment advisor;    (b)      the employee benefit plan has total assets in excess of $5,000,000; or  (c)      it is a self-directed plan, with investment decisions made solely by persons that are accredited investors;

        (v)       It is a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees and such plan has total assets in excess of $5,000,000.

        (vi)       It is an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act;

        (vii)       It is a Small Business Investment Company licensed by the U.S. Small Business Administration;

OR

        (viii)       It is a bank, savings and loan association, or insurance company as defined in the Securities Act of 1933;

        (f)     The Undersigned (i) has adequate means of providing for its current needs and possible personal contingencies, (ii) has no need for liquidity in this investment, (iii) is able to bear the economic risks of its investment in the Securities, and (iv) at the present time, can afford a complete loss of such investment.

        (g)     The Undersigned is purchasing the Securities for its own account for investment, and not for distribution, assignment or resale to others, and no other person has any direct or indirect beneficial interest in such Securities.

        (h)     The Undersigned understands that (i) there is and will be no market for the Securities; (ii) the sale of the Securities has not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act") in reliance on the exemption for non-public offerings provided by Section 4(2) of the Securities Act and Regulation D promulgated thereunder and must be held indefinitely unless the Securities are subsequently registered under the Securities Act or an exemption from such registration is available; (iii) the Company is under no obligation to register the Securities on its behalf or to assist it in complying with any exemption from registration; and (iv) the Securities may not be sold pursuant to Rule 144 promulgated by the Securities and Exchange Commission pursuant to the Securities Act unless all of the conditions of

CAPITAL0005422

that Rule are met.

(i)     The Undersigned understands that no federal or state agency has passed upon the Securities, or made any finding or determination as to the fairness of the investment, or any recommendation or endorsement of the Securities. The Undersigned understands that the Memorandum may not have been filed with or reviewed by certain state securities administrators because of representations made by the Company as to the private or limited nature of the Offering. The Undersigned will not transfer the Securities without registering or qualifying the same under applicable state securities laws unless such transfer is exempt under such laws.

(j)     The Undersigned has not been furnished any offering literature other than the Memorandum and other materials which the Company may have provided at the request of the Undersigned, and the Undersigned has relied only on the information contained in the Memorandum and the information furnished or made available to the Undersigned by the Company, as described in subparagraphs (c) and (d) above.

(k)     The Undersigned has not distributed the Memorandum to any person, and no person other than the Undersigned has used the Memorandum.

(l)     The Undersigned is organized under the laws of a state of the United States, and is authorized and otherwise duly qualified to purchase and hold the Securities, and such entity has its principal place of business at the address set forth on the signature page hereof.

(m)     All information which the Undersigned has provided to the Company concerning the knowledge of financial and business matters of the person making the investment decision on behalf of such entity, including all information contained herein and in the accompanying Investor Questionnaire, is true and complete as of the date set forth at the end hereof, and if there should be any adverse change in such information prior to this subscription being accepted, the Undersigned will immediately provide the Company with accurate and complete information concerning any such change.

(n)     The Undersigned certifies, under penalties of perjury, (i) that the federal taxpayer identification number shown on the signature page of this Agreement is true and complete, and (ii) that the Undersigned is not subject to backup withholding either because the Undersigned has not been notified that it is subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified the Undersigned that it is no longer subject to backup withholding.

CAPITAL0005423

4.    *Indemnification*.  The Undersigned agrees to indemnify and hold harmless the Company, its officers, directors, employees, members and affiliates, and any person acting on behalf of the Company, from and against any and all damage, loss, liability, cost, and expense (including attorney fees) which any of them may incur by reason of the failure by the Undersigned to fulfill any of the terms or conditions of this Agreement, or by reason of any breach of the representations and warranties made by the Undersigned herein, in the Undersigned's Investor Questionnaire, or in any other document provided by the Undersigned to the Company.  All representations, warranties and covenants contained in this Agreement, and the indemnification contained in this paragraph 4, shall survive the acceptance of this subscription.

5.    *Compliance with Section 4(2)*.  The Undersigned understands and agrees that the following restrictions and limitations are applicable to its purchase of the Securities which are being sold to him/her in reliance on the exemption from registration contained in Section 4(2) of the Securities Act:

(a)    The Securities may not be sold, pledged, hypothecated or otherwise transferred unless they are registered under the Securities Act and applicable state securities laws or are exempt therefrom.

(b)    A legend to the following effect will be placed on any certificates representing the Securities:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, OR HYPOTHECATED IN THE ABSENCE OF ANY EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL (WHICH MAY BE COUNSEL TO THE COMPANY) SATISFACTORY TO THE COMPANY TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQURIED."

(c)    Stop transfer instructions to the transfer agent, if any, of the Securities have been or will be placed with respect to the Securities so as to restrict resale, pledge, hypothecation or other transfer thereof, subject to the provisions hereof, including the provisions of the legend referred to in subparagraph (b) above.

6.    *No Waiver*.  Notwithstanding any of the representations, warranties, acknowledgements, or agreements made herein by the Undersigned, the Undersigned does not thereby or in any other manner waive any of the rights granted to him under federal or state securities laws.

7.    *Entire Agreement; Modification*.  This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and neither this Agreement nor any provisions hereof shall be waived, changed, discharged, or

CAPITAL0005424

terminated except by an instrument in writing signed by the party against whom any waiver, change, discharge, or termination is sought.

8.    *Notices.*  Any notice, demand, or other communication which any party hereto may be required, or may elect, to give to anyone interested hereunder shall be sufficiently given if (a) deposited, postage prepaid, in the United States mail, registered or certified mail, addressed to:  in the case of the Company, EFG America, LLC, c/o Niehaus Wise & Kalas, Ltd., 7150 Granite Circle, Toledo, Ohio 43617, and in the case of the Undersigned at the address set forth on the signature page hereof or at such other address as the Undersigned shall so notify pursuant hereto, or (b) delivered personally at such address.

9.    *Binding Effect.*  Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and assigns.    If the Undersigned is more than one person, the obligations of the Undersigned shall be joint and several and the agreements, representations, warranties, and acknowledgements herein contained shall be deemed to be made by and be binding upon each such person and its respective heirs, executors, administrators, successors, legal representatives, and assigns.

10.    *Assignability.*  The Undersigned agrees not to transfer or assign this Agreement, or any of the Undersigned's interest herein.

11.    *Applicable Law.*  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the choice of law provisions thereof.

12.    *Form of Ownership.*  Please indicate form of ownership desired:

_____ Corporation
_____ Partnership
_____ Trust
_____ Other (specify) _____

\*        \*        \*

IN WITNESS WHEREOF, the Undersigned has executed this Agreement on the _____day of _____, 2014.


ORGANIZATIONS SIGN HERE

NOTE:   If signed on behalf of a corporation,
Please attach resolution authorizing investment.
A copy of the organization's Articles of Incorporation
and By-Laws, Partnership Agreement, Declaration
of Trust, or other governing instrument must be
submitted with the Purchaser Questionnaire.


_____
Printed Name of Organization


By _____
Signature


_____
Printed Name and Title


By _____
(Additional signature if required by governing instrument)


_____
Printed Name and Title


_____
Federal Taxpayer Identification Number

Address of Principal Place of Business:


_____

_____

_____

CAPITAL0005426

## JOINDER AGREEMENT

### ADDENDUM TO THE
### Royalty Agreement and Certificate

### ADDITIONAL INVESTOR SIGNATURE PAGE

**IN WITNESS WHEREOF**, pursuant to the Royalty Agreement and Certificate dated on or about December 9, 2014, in consideration of and as a condition to the undersigned's acquiring an Investor Royalty Percentage Interest, the undersigned hereby executes and enters into this Addendum to the Royalty Agreement and Certificate as an additional Investor, as of the effective date of the undersigned's acquisition of the Investor Royalty Percentage Interest as that term is defined under the Royalty Agreement and Certificate.

By execution of this signature page and on such effective date, the undersigned becomes a party to the Royalty Agreement and Certificate and agrees to be bound in all respects by the terms and conditions of this Royalty Agreement and Certificate on such effective date.

Date Signed:_____

Entity Name:_____

By:_____

_____
Print Name

CAPITAL0005427

**<u>Acceptance of Subscription Agreement</u>**

      The undersigned, on behalf of EFG America, LLC, herenow accepts this Subscription Agreement in reliance upon the terms contained herein and in reliance upon the representations made by the above subscriber.  This Subscription Agreement is accepted and became binding upon the Company on the date of execution of the Company as indicated below.

Date:_____

EFG America, LLC

By:_____
          Douglas Elroy Fimrite

Its:_____

CAPITAL0005428