John M. McHugh
Reilly LLP
1700 Lincoln Street, Suite 2400
Denver, CO 80203
Phone: (303) 893-6100
Fax: (303) 893-6110
jmchugh@rplaw.com

*Attorney for Plaintiff
Eversource Capital, LP*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Eversource Capital, LP,<br><br>             Plaintiff,<br><br>v.<br><br>Douglas Elroy Fimrite, et al.,<br><br>             Defendants. | No. 2: 18-cv-02583-SMM<br><br>**(PUBLIC) PLAINTIFF'S MOTION FOR SANCTIONS FOR EFG DEFENDANTS' DISCOVERY MISREPRESENTATIONS** |

Defendants have made multiple, material misrepresentations to Plaintiff Eversource Capital, LP ("Capital") and this Court. Capital, therefore, brings this motion requesting the Court exercise its inherent authority and sanction Defendants Douglas Elroy Fimrite; EFG America, LLC ("EFG"); Enviropark Texas, LLC; EF Global Corporation ("EF Global"); EFG Polymers, LLC; D&H Sophie Brown, LLC; Ocean Sky Finance; and Tex-Gas Holdings, LLC (collectively "EFG Defendants") to remedy the prejudice to Capital caused by these misrepresentations.

The Ninth Circuit recognizes "as part of a district court's inherent power the broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (citation omitted, cleaned up). Misrepresentations made by a party in the course of discovery warrant imposition of sanctions under the Court's inherent authority. *See Excel Fortress Ltd. v. Wilhelm*, 2019 WL 2503684, **5, 7 (ordering sanctions against EFG to cure the prejudice caused by its misleading statements to counsel and the Court); *Excel Fortress Ltd. v.*

*Wilhelm*, 2019 WL 5294837, at **6, 6 n.2 (D. Ariz. Oct. 18, 2019) (deciding that monetary sanctions against EFG and its counsel was the appropriate sanctions for those misrepresentations "during the discovery process"); *Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 286-87 (N.D. Cal. 2015); *Englebrick v. Worthington Indus., Inc.*, 944 F. Supp. 2d 899, 909-912 (C.D. Cal. 2013) (false discovery responses warranted dismissal of claims); *Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001) ("bad faith or conduct tantamount to bad faith" warrants imposition of sanctions under the Court's inherent authority). Sanctions under the Court's inherent authority can include monetary sanctions, "making judgements about the evidence, imposing adverse evidentiary determinations—and, indeed, in appropriate circumstances entering a default judgment[.]" *Beck v. Test Masters Ed. Servs., Inc.*, 289 F.R.D. 374, 379 (D.D.C. 2013); *Excel Fortress Ltd.*, 2019 WL 5294837, at *6 (imposing monetary sanctions). The submission of false statements under oath requires meaningful sanctions. *See, e.g.*, *Rivera v. Drake*, 767 F.3d 685, 687 (7th Cir. 2014) ("If perjury pays benefits when it escapes detection, but has no cost when detected, there will be far too much perjury and the accuracy of judicial decisions will be degraded.") Here, sanctions are warranted because: (1) EFG Defendants submitted multiple false, under oath responses to discovery and (2) made misrepresentations to the Court and to Capital regarding claimed cash transfers from Gate Corporation to EF Global.

**I.    Defendants submitted multiple, false responses to discovery.**

   A.    <u>Defendants submitted false discovery responses regarding Texen Holdings.</u>

The 2015 General Ledger provided to Capital shows ▇▇▇ in intercompany transfers from EFG to Texen Holdings, LLC (and a ▇▇▇ transfer from Texen Holdings to EFG). Ex. A at CAPITAL0000952. In its first set of interrogatories, Capital asked the EFG Defendants to explain the business relationship between EFG and Texen Holdings "from April 1, 2012 to the present," in order to evaluate the legitimacy of these transfers. Ex. B at 9. The EFG Defendants initially claimed that "Texen Holdings LLC has no business relationship with EFG America, LLC." *Id.* at 10. After conferral, during which the 2015 General Ledger entries were discussed, the EFG Defendants supplemented their response. To avoid any ambiguity about the time period for which they were responding, the EFG Defendants claimed that the "<u>following</u> financial

relationships were reviewed by Ryan McHugh, then Chief Financial Officer of EFG America, in his review in 2016 <u>of the 2015 general ledger and financials</u>." *Id.* at 10-11. The EFG Defendants then stated under oath that ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ *Id.* at 13, 23.

On December 28, 2020, almost 22 months <u>after</u> the above response had been submitted and after Capital amended its complaint in reliance on the EFG Defendants' discovery response, (Doc. 143 at ¶¶ 246-249,) the EFG Defendants have now decided that "Defendant Texen Holdings, LLC did not have a bank account from April 1, 2012 to the present." Ex. C at 5. Either the EFG Defendants' prior response that ███████████████████████████████████ was false when it was submitted, or the EFG Defendants' contradictory claim that Texen Holdings never had a bank account is false. Whichever it is, the EFG Defendants have engaged in bad-faith conduct in discovery in this case, which has caused Capital prejudice in amending its complaint, responding to Texen Holding's motion to strike and to dismiss, and in submitting discovery to Texen Holdings. (Doc. 170); Ex. D. Tellingly, the EFG Defendants have also repeatedly refused to provide the complete bank statements for EFG during this time period, which would have quickly disclosed to whom the transfers attributed to Texen Holdings actually went. Ex. C at 4-5. Because of these false statements, Capital still does not know to whom these transfers went and why, leaving the EFG Defendants to make up another explanation.

      B.    <u>Defendants submitted false discovery responses regarding loans to "legacy" investors, including Doris Fimrite.</u>

In deciding to issue all of its loans (totaling $1.2 million) to EFG, Capital relied on EFG's representations that it was properly using funds for limited business purposes as defined in EFG's private placement memorandum ("PPM"). (Doc. 143 ¶ 174; Doc. 143-6.) EFG also provided to Capital a copy of its 2015 General Ledger. Ex. A. While the 2015 General Ledger

3

shows a debt to Doris Fimrite of ▓▓▓▓▓▓, it also shows no payments made on that loan during 2015. Ex. A at CAPITAL0000956. What Capital has since learned is that EFG disguised over ▓▓▓▓▓▓ in payments to Mrs. Fimrite in 2015 alone by listing them as "intercompany" transfers to Carey Holdings, payments to Kokanee Mortgage, and booking them as "travel and accommodations" expenses. Ex. A at CAPITAL000954, 964, 965, 971, 972, 976, 983; *see also* Ex. E at 87:7-17, 146:23-147:8 (payments to Ocean Park Ford were for the lease on two vehicles as part of the debt owed to Mrs. Fimrite). According to Mrs. Fimrite, EFG (either directly or through Carey Holdings) makes payments for the first and second mortgages on her home, the mortgage on her and Mr. Fimrite's vacation home, the utilities for both homes and lease payments on two cars titled in Mrs. Fimrite's name. Ex. E at 9:16-10:17, 94:18-95:17.

      To evaluate whether EFG was properly using investor funds for the limited purposes set forth in the PPM (rather than, for example, simply enriching the Fimrite family at investor's expense), Capital served Interrogatories Nos. 6 and 14, which ask for a list of "loans, advances, and repayments between EFG America, LLC" and a list of individuals and entities, including Mrs. Fimrite, "including the date funds were loaned, advanced, or repaid, business purpose of transaction, whether there is a promissory note or documentation for repayment terms, what account the funds were deposited into and if there is any repayment schedule," and a list of "all payments from EFG America" to certain individuals, including Mrs. Fimrite, "including date, payee name, business purpose, invoice number, description of transaction or services rendered, amount and method of payment." Ex. F at 4-5, 6. Capital served these interrogatories over two years ago (on December 12, 2018). Ex. F. Since then, Capital has engaged in extensive efforts to secure complete answers to these interrogatories and, as a result of the efforts, the EFG Defendants have provided no less than four different responses to Interrogatory No. 6 and two different responses to interrogatory No. 14. Ex. B at 5-9, 15-16; Ex. G at 1-11. The EFG Defendants' prior responses were provided under oath. Ex. B at 23; Ex. N at 1-8, 16.

      Nearly two years after these requests were served (and less than two months before the close of discovery), the EFG Defendants provided their fourth supplemental response, which does not supplement their prior, under oath, responses but, instead, provides a completely

different and new explanation for these loans and payments, conceding that their prior answers were false. For example, the debt allegedly owed to Mrs. Fimrite went from ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Contrast* Ex. G at 2-3, 5-6 *with id.* at 7-10. Similarly, the loans from Mr. Hadfield went from ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Contrast id.* at 2 *with id.* at 5 *and id.* at 8.

The EFG Defendants' prior, sworn responses cannot be an inadvertent mistake. In their prior responses, the EFG Defendants explicitly directed Capital to a loan agreement between Mrs. Fimrite and Mr. Fimrite from 2011. Ex. G at 3 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, 5 (same). That particular loan agreement is for ▇▇▇▇ and shows that the majority of that amount was not loaned to an EFG-related entity for business purposes, but rather to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. H at 2. Mrs. Fimrite testified, when she entered into this agreement, she understood that Mr. Fimrite had "<u>personal</u> debt that he needed to restructure or refinance and that's what [she was] lending him money to do[.]"Ex. E at 76:4-77:6. Mrs. Fimrite's under-oath testimony, along with the terms of the 2011 Agreement and the EFG Defendants' prior responses, created a problem: if the ▇▇▇▇ owed to Doris Fimrite under the 2011 Agreement was part of the debt being repaid by EFG, then EFG investor funds were being used to pay off Elroy Fimrite's personal debt – something the PPM does not permit. (Doc. 143-6 at 20.)[1]

---

[1] Mrs. Fimrite's also testified that she had not disclosed another written agreement related to repayments currently being made by the EFG Defendants. Ex. E at 62:23-63:12. Despite discovery requests for exactly this type of document, EFG Defendants did not produce the written agreement for almost two months. Those agreements are dated 1992 and 1995, approximately two decades before EFG was formed and show that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ According to Mrs. Fimrite's under-oath testimony, the EFG Defendants are still paying off this 20+ year old debt owed by Mr. Fimrite personally.

5

1    The EFG Defendants appear to have decided that the solution to this problem is simply to
2 disavow their prior, under-oath answers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Now, the debt owed to Mrs. Fimrite is free and clear of any ▮▮▮▮▮
4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. G at 8. Indeed, the EFG
5 Defendants cannot even identify the amount of money owed to Mrs. Fimrite, though it has
6 somehow risen to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. G at 9-10. In
7 other words, there is now no way to validate these loans or determine if the payments are proper
8 other than to just accept the EFG Defendants' assurance that EFG is paying for Mr. and Mrs.
9 Fimrite's home in Canada, vacation home, utilities, and cars for legitimate business purposes
10 rather than the obvious theft that is occurring. And the EFG Defendants can always ascribe any
11 amount of payments made as "interest" payments allowing them to make transfers to benefit Mr.
12 Fimrite and his wife in perpetuity. Indeed, in 2015 alone, over ▮▮▮▮▮ was paid in claimed
13 interest on a ▮▮▮▮ debt to Mrs. Fimrite, an interest rate of approximately ▮▮

14    The EFG Defendants cannot blame their prior, false answers based on a lack of relevant
15 information. The EFG Defendants are the only party with relevant knowledge of the debts they
16 owe to third parties. Thus, there was no reliance on misinformation from a third party. Instead,
17 the EFG Defendants took one position under oath for almost two years and completely changed
18 their position after the deposition of Mrs. Fimrite exposed the problems with their prior position.
19 The Court need not determine which of the contradictory response are accurate: either way, the
20 EFG Defendants submitted false information in response to discovery. That alone warrants the
21 imposition of sanctions under the Court's inherent authority. *Excel Fortress Ltd.*, 2019 WL
22 2503684, **5, 7; *Lofton*, 308 F.R.D. at 286-87; *Englebrick*, 944 F. Supp. 2d at 909-912.

23    But the EFG Defendants' intentional, bad-faith conduct has also prejudiced Capital.
24 Capital reasonably relied on the EFG Defendants' prior, sworn interrogatory responses in
25 pursuing additional discovery. Capital deposed Mrs. Fimrite and questioned her extensively on
26 EFG's prior discovery responses as well as the identified 2011 Agreement. Ex. E at 67:7-77:9,
27 112:5-125:8. Capital now needs to re-depose Mrs. Fimrite based on Defendants' new positions
28 regarding the debt owed to her.

6

Finally, the EFG Defendants' most recent responses to Interrogatories Nos. 6 and 14 do not even provide the information requested by the interrogatories. The EFG Defendants do not provide the dates the loans were made or repaid, the specific business purpose for each loan, or to whom the loans were originally made ("what account the funds were deposited into"). Ex. G at 1-10. Instead, the EFG Defendants merely state that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* at 7-8. Tellingly, the EFG Defendants studiously avoid representing that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Although, in response to Interrogatory No. 14, the EFG Defendants (after two years) finally identify that EFG investor funds are used to pay for ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ they only provide the payments requested for 2015 and 2016 (but not, for example, the business purpose behind EFG paying for ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ where EFG has no operations), even though the Court has already ruled that information related to EFG's use of funds "from April 1, 2012 to the present" is relevant and not overbroad. (Doc. 227 at 7). Despite the Court's order, the EFG Defendants continue to refuse to produce information or documents related to EFG's finances outside of 2015 and limited information for 2016 and apparently will require the Court to individually compel responses to every discovery request that seeks this type of information.

      C.     <u>Defendants submitted false discovery responses regarding payments to Mr. Li.</u>

One of the EFG Defendants' more incredible schemes is the use of EFG investor funds to purchase technology for Excel Fortress from an individual named Li Xing Ru and then requiring EFG investors' royalties for the use of the technology purchased by their own funds. (Doc. 143 ¶¶ 64-76.) Of course, the EFG Defendants could not tell their investors how their money would be used because only a fool would pay for another company to buy technology and then pay that

company royalties. Instead, any reasonable investor would have demanded that EFG purchase the technology outright and forego the royalty payments to companies closely-held by Mr. Fimrite. So the EFG Defendants falsely represented to investors, including Capital, that the technology EFG would be using was already owned by Excel Fortress. (Doc. 143 ¶ 70.)

The investors, however, were not the only ones EFG mislead about the payments for the technology. Judge Lanza previously sanctioned EFG (and its counsel) for "repeated misstatements" in EFG's prior litigation against Capital and other parties regarding these payments, including sanctioning them for producing "an incomplete set of financial records, which had key pages removed, and only produc[ing] the complete set–which revealed that [EFG's] counsel's earlier representations were false–after [the defendant] repeatedly objected." *Excel Fortress Ltd.*, 2019 WL 5294837, at **6, 6 n.2.

Because this scheme forms part of Capital's fraud allegations against the EFG Defendants, Capital served Interrogatory No. 30: "Describe in detail the source of funds used to pay Mr. Li for the technology under the 2012 contract." Ex. G at 11. Apparently undeterred by those prior sanctions, the EFG Defendants chose to state under oath that "the initial payment was from a loan by Doris Fimrite pursuant to a written agreement and funded by a mortgage on her residence." Ex. O at 12-13, 27. The problem with this position is that it is contradicted by the referenced written agreement as confirmed by Mrs. Fimrite's under-oath testimony.[2] Having apparently decided that their prior under-oath answer (that Mrs. Fimrite provided the "initial payment" to Mr. Li) caused more problems than it solved, the EFG Defendants simply changed their answer and stated that the "initial payment to Dr. Li was from a loan by Ian Hatfield." Ex.

---

[2] Instead, as the 2011 agreement makes clear, the loan from Mrs. Fimrite was for "past compensation" to Mr. Li arising from his employment between 2004 and 2010, not for the technology purchased by EFG investors under the 2012 contract with Mr. Li. Ex. E 68:7-71:8; Ex. H at 1-2. As the 2011 Agreement makes clear, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8

G at 11. Again, this cannot be the product of an innocent mistake or misinformation; the information necessary to answer Interrogatory No. 30 is held exclusively by the EFG Defendants. And again, it does not matter for purposes of this motion which of these responses are false; one of them must be and the decision to provide a false response to discovery was clearly made in bad faith and is prejudicial to Capital since it already deposed Mrs. Fimrite on the basis of the prior discovery answer. Ex. E at 68:7-71:8. Finally, Capital notes that no "initial payment" to Mr. Li from either Mrs. Fimrite or Ian Hatfield was disclosed in the prior litigation. *Excel Fortress Ltd.*, 2019 WL 2503684, at *6. Either EFG once again mislead Judge Lanza and Capital in the prior litigation about the source of funds to pay Mr. Li, or it is misleading this Court and Capital now. Either way, sanctions are appropriate.

## II. Defendants made misrepresentations to Capital, the Court, and the IRS.

EF Global's tax returns represent that Defendant Gate Corporation ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to EF Global. Ex. J at EFGLLC000311; EFGLLC002910; EFGLLC002933[3] Capital sought the production of bank records to support these cash transfers and the EFG Defendants objected, representing to Capital and the Court that "the three cash transfers surrounding Eversource's request are isolated transfers" and not relevant. (Doc. 227 at 10.) The Court ordered the production of the requested documents. (*Id.*) Despite their representations to the Court (and after forcing the Court to resolve the discovery dispute), the EFG Defendants informed Capital that no responsive documents exist because the cash transfers reflected in EF Global's filed tax returns <u>never occurred</u> and that EF Global would be filing amended tax returns. Ex. L.

Here again, the EFG Defendants' prior misrepresentations cannot be attributed to an innocent mistake or mere carelessness. The EFG Defendants initially represented, under oath, that these cash transfers occurred in their tax returns submitted to the IRS. Ex. J at

---

[3] Defendant EF Global is the parent company of EFG and treats EFG as a "disregarded" entity for tax purposes, meaning that EF Global's tax returns reflect "information regarding those funds coming into and out of EFG". The Court has already ruled that Capital is "entitled to discover" that type of information. Ex. K; (Doc. 227 at 7).

9

EFGLLC002898, 2916. And when Capital sought discovery on these transfers, the EFG Defendants did not simply respond that no such documents exist, they objected and represented to the Court and to Capital that these "isolated transfers" were simply not relevant and therefore responsive documents need not be produced. (Doc. 227 at 10.) Only after the Court ordered the EFG Defendants to produce supporting documentation did the EFG Defendants concede their tax returns were false and claim that they intend to amend them at some unspecified time in the future. And again, Capital was prejudiced by these misrepresentations: *first*, Capital was required to submit a discovery dispute to the Court based on the representations that these transfers occurred and *second*, Capital served additional discovery on Gate Corporation related to these transfers. Ex. M 1-2. While Gate Corporation admitted, months after the EFG's false representations to the Court and Capital, that these transfers never occurred, it also falsely stated that it never represented that it made these cash transfers. *Id*. Since Mr. Fimrite verified all of the discovery responses at-issue (as well as signing the tax returns), all of the EFG Defendants knew the entire time that these transfers never occurred and their contrary misrepresentations have wasted both the Court's and Capital's time and incurred unnecessary filings, orders, costs and expenses. Ex. J at EFGLLC002898, EFGLLC002916; Ex. M at 8.

## CONCLUSION

Given the EFG Defendants' numerous false sworn statements, sanctions under the Court's inherent authority are warranted. While these type of bad-faith, false discovery responses may warrant the ultimate sanction of dismissal of claims, *Englebrick*, 944 F. Supp. 2d at 910-911, the sanctions imposed must at least address the harm caused by the deception and deter further misconduct. *Id.* at 910; *Excel Fortress Ltd.*, 2019 WL 2503684, **5, 7. Here, Capital seeks sanctions sufficient to address the harms caused by the EFG Defendants' repeated deceptions. Therefore, the Court should impose the following sanctions on the EFG Defendants:

1) Payment of Capital's reasonable fees and costs incurred in bringing this motion;
2) A finding that the payments to Carey Holdings, Kokanee Mortgage, Ocean Park Ford and any other payments related to claimed loans from Doris Fimrite have no legitimate business purpose but are, instead, a misuse of EFG investor funds;

3) A finding that all claimed intercompany transfers from EFG to Texen Holdings, LLC, are transfers to Mr. Fimrite personally, with no legitimate business purpose and are a misuse of EFG investor funds;

4) Payment of Capital's reasonable fees and costs incurred in submitting the discovery dispute regarding Document Request No. 37 (Doc. 214);

5) Production of all documents, including accountant work papers, related to the claimed cash transfers from Gate Corporation to EF Global;

6) Production of all bank records for EFG America, including its "proxy" accounts in the name of D&H Sophie Brown and International Tejas;

7) Immediate production of amended tax returns for EF Global;

8) Complete responses to Interrogatories No. 6 and 14; and

9) To the extent items 5-8 are provided after the depositions of Elroy Fimrite, EFG America, EF Global and/or Gate Corporation, an order that any such previously- deposed defendant sit for an additional hour deposition at the EFG Defendants' expense.

These sanctions are both reasonable and necessary in light of the EFG Defendants' cavalier attitude toward discovery and the prejudice caused by their multiple misrepresentations. Lesser sanctions do not adequately deter the EFG Defendants' misconduct and would only place the EFG Defendants in the position that they would have been had they been honest from the beginning. Sanctions of that nature are inadequate. *Rivera*, 767 F.3d at 687 (holding that even the extreme sanction of dismissal of the suit was not an adequate sanction in light of the plaintiff's repeated deceit). Further, alternative sanctions that require further discovery will simply delay resolution of this case and EFG has already shown that monetary sanctions do not adequately deter it from making false or misleading statements in discovery. *Excel Fortress Ltd.*, 2019 WL 5294837, at *6; *see also Rivera*, 767 F.3d at 687-88 (considering plaintiffs misconduct in other cases in determining the appropriate sanctions to deter future misconduct).

      Capital therefore respectfully requests the Court enter an order imposing these sanctions on the EFG Defendants.

Dated this 4th day of January, 2021.

>Respectfully submitted,
>
>*s/ John M. McHugh*
>John M. McHugh (*pro hac vice*)
>REILLY LLP
>1700 Lincoln Street, Suite 2400
>Denver, CO 80203
>(303) 893-6100
>jmchugh@rplaw.com
>
>*Attorney for Plaintiff Eversource Capital, LP*

# CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of January, 2021, I electronically transmitted the attached document to the Clerk of the Court's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Scot A. Hinshaw
NIEHAUS KALAS HINSHAW, LTD.
7150 Granite Circle, Suite 203
Toledo, OH 43617
Phone:  419-517-9090
Fax: 419-517-9091
hinshaw@nwklaw.com

Christopher H. Bayley
Anthony King
SNELL & WILMER L.L.P.
400 E. Van Buren Street
Phoenix, Arizona 85004-2202
Phone:  602-382-6214
cbayley@swlaw.com
aking@swlaw.com

*Attorneys for Defendants*

/s/ *John M. McHugh*
John M. McHugh