# EXHIBIT E

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3

4   Eversource Capital, LP,     ) Case No.
     an Idaho limited           ) 2:18-cv-02583-SMM
5   partnership,                )
                                )
6          Plaintiff,           )
                                )
7   vs.                         )
                                )
8   Douglas Elroy Fimrite,      )
     et al.,                    )
9                               )
           Defendants.          )
10  _____  )

11

12          VIDEOTAPED VIDEO-CONFERENCED

13          DEPOSITION OF DORIS FIMRITE

14               NOVEMBER 2, 2020

15

16               Witness location:

17          Victoria, British Columbia, Canada

18

19

20   Reported by:

21   Lisa O'Sullivan

22   Az CR No. 50952

23   Ca CSR No. 7822

24   RMR, CRR

25   Job No. 185924

Page 2

1     Videotaped video-conferenced deposition of Doris

2  Fimrite, called as a witness by counsel for the

3  Plaintiff in the matter titled above, pursuant to

4  Notice, beginning at 8:33 a.m. and ending at

5  1:49 p.m. Pacific Standard Time, on Monday,

6  November 2, 2020, before Lisa O'Sullivan, Arizona

7  Certified Reporter No. 50952, California Certified

8  Shorthand Reporter No. 7822, Registered Merit

9  Reporter, Certified Realtime Reporter.

10

11          APPEARANCES OF COUNSEL

12

13  For the Plaintiff:

14  Reilly

15  By: John McHugh, Esq.

16  1700 Lincoln Street

17  Denver, Colorado 80203

18

19  For the Defendants:

20  Niehaus Kalas Hinshaw Ltd.

21  By: Scot Hinshaw, Esq.

22  7150 Granite Circle

23  Toledo, Ohio 43617

24

25

1   APPEARANCES OF COUNSEL (Continued):

2

3   For the Defendants:

4   Snell & Wilmer

5   By: Anthony King, Esq.

6   One Arizona Center

7   400 East Van Buren Street

8   Phoenix, Arizona 85004

9

10   Also Present:

11   Richard Rinkewich, Videographer

12   Ryan McHugh

13   Candice McHugh

14

15   (All participants appearing via video conference.)

16

17

18

19

20

21

22

23

24

25

1          D. FIMRITE

2     MONDAY, NOVEMBER 2, 2020; 8:33 A.M. PST

3          - - -

4     THE VIDEOGRAPHER:  Good morning,

5  counselors.  My name is Robert Rinkewich.  I'm the

6  legal videographer in association with TSG

7  Reporting, Inc.

8          Due to the severity of the COVID-19 and

9  following the practice of social distancing, I

10  will not be in the same room with the witness.

11  Instead, I'll record this videotaped deposition

12  remotely.  The reporter, Lisa O'Sullivan, also

13  will not be in the same room and will swear the

14  witness remotely.

15          Do all parties stipulate to the validity

16  of this video recording and remote swearing and

17  that it will be admissible in the courtroom as if

18  it had been taken following Rule 30 of the Federal

19  Rules of Civil Procedure and the state's rules

20  where this case is pending?

21     MR. McHUGH:  John McHugh for plaintiff.

22  Yes, I stipulate.

23     MR. HINSHAW:  Scot Hinshaw on behalf of

24  the defendants and the witness.  Yes.

25          THE VIDEOGRAPHER:  Thank you.  This is

1         D. FIMRITE

2  the start of media label number 1 of the

3  video-recorded deposition of Doris Fimrite in the

4  matter of Eversource Capital, LP, an Idaho limited

5  partnership, versus Douglas Elroy Fimrite, et al.,

6  in the United States District Court for the

7  District of Arizona.

8         This deposition is being held

9  telephonically and video-streamed on November 2nd,

10  2020, at approximately 8:33 a.m.

11         My name is Robert Rinkewich, the legal

12  video specialist from TSG Reporting, Inc.,

13  headquartered at 228 East 45th Street, Suite 810,

14  New York, New York.  The court reporter is Lisa

15  O'Sullivan in association with TSG Reporting.

16         Counsel, please introduce yourselves.

17         MR. McHUGH:  John McHugh for plaintiff

18  Eversource Capital.

19         MR. HINSHAW:  Scot Hinshaw on behalf of

20  defendants.

21         MR. KING:  Anthony King on behalf of the

22  defendants.  And with us here today is the

23  deponent, Doris Fimrite.

24         THE VIDEOGRAPHER:  Will the reporter

25  please swear in the witness.

1              D. FIMRITE

2              DORIS FIMRITE,

3        having been first duly sworn or affirmed,

4         was examined and testified as follows:

5                 EXAMINATION

6   BY MR. McHUGH:

7     Q.   Good morning, Mrs. Fimrite.  As I said

8   early, my name is John McHugh, and I represent the

9   plaintiff Eversource Capital.

10        Just a couple preliminary questions for

11   you.  What kind of device are you using to

12   participate in this deposition?

13     A.   Computer.

14     Q.   Okay.  Does that computer show

15   announcements or notifications if you receive emails

16   or text messages?

17     A.   Typically.

18     Q.   Okay.  Where is your cell phone?

19     A.   It's in the kitchen probably.

20     Q.   Okay.  And you are not in the kitchen?

21     A.   No, I'm not.

22     Q.   Okay.  Is there anyone else in the room

23   with you?

24     A.   There is not.

25     Q.   Okay.  Do you know how to shut off the

1                    D. FIMRITE

2   notification on your computer so that it doesn't show

3   you if you have emails or text messages?

4       A.  I'm not sure.

5       Q.  Okay.  Maybe during a break we can -- you

6   can take a look at it.  You don't need to do anything

7   about it now.

8       A.  Thank you.

9       Q.  Are you -- where are you currently located?

10      A.  In my home.

11      Q.  And what's the address for that?

12      A.  5630 Batu Road, Victoria, British Columbia.

13      Q.  And how long have you lived at that

14  address?

15      A.  For 36 years.

16      Q.  Okay.  And is the house completely owned,

17  or is there existing mortgages on the house?

18      A.  There are mortgages on the house.

19      Q.  Are there two mortgages?

20      A.  Yes.

21      Q.  Do you know how much is outstanding on the

22  first mortgage?

23      A.  Approximately.

24      Q.  Okay.  What's the approximate amount?

25      A.  250,000.

1                    D. FIMRITE

2     Q.   And how about the second mortgage?

3     A.   255.  I'm sorry.  The second is

4   approximately 700,000-plus.

5     Q.   And you said the first mortgage was 155?

6     A.   No, no.  255.

7     Q.   Oh, okay.  Thank you.

8     A.   Those are approximations.

9     Q.   Okay.  And who is primarily responsible or

10   who makes most of the mortgage payments on the first

11   mortgage?

12     A.   I do.

13     Q.   Okay.  And what's your source of income for

14   making those mortgage payments?

15     A.   The payments are made through Carey

16   Holdings from companies owned by Elroy Fimrite, in

17   repayment of monies lent to them.

18     Q.   Okay.  So your first mortgage repayments --

19   I'm sorry.  Your first -- strike that.  Let me start

20   again.

21         Payments on your first mortgage are being

22   made by Carey Holdings from funds transferred to

23   Carey Holdings from entities owned by Mr. Fimrite?

24     A.   That is correct.

25     Q.   And how long has that been the arrangement

Page 62

1              D. FIMRITE

2  agreement?

3     A.  I don't remember the details.

4     Q.  How do you remember that you have a written

5  agreement?

6     A.  I have a file in my drawer somewhere where

7  I throw things in there that are relative to my

8  finances and my interactions with Elroy and I.

9     Q.  Okay.  And did you provide that file to

10  your counsel when you were asked for documents

11  related to transactions between you and any of the

12  defendants including your husband?

13     A.  No, I didn't, because this is going back

14  many years and isn't -- wasn't within the relative --

15  or what I thought was the relative period of time.

16     Q.  Okay.  I'm going to ask you to provide that

17  file to your husband -- sorry -- to your counsel so

18  that he can determine if it should be produced.  Can

19  you do that?

20     A.  I could.

21     Q.  Okay.  Do you have that file nearby?

22     A.  No.

23     Q.  Okay.  What is the subject matter of the

24  other written agreement that you have besides the

25  2011 agreement that you produced?

1              D. FIMRITE

2      A.   Just an agreement that I would lend Elroy

3   some money and he would -- and we signed the document

4   agreeing for the amount of money that I would have

5   lent him.

6      Q.   And when was that document?  Approximately

7   when was that document done?

8      A.  I don't remember.

9      Q.   Okay.  Is that related to payments that you

10   currently receive?  So in other words, is that an

11   outstanding debt obligation?

12      A.   Yes.

13      Q.   Okay.  And do you currently receive

14   payments on that debt through Carey Holdings?

15      A.   Not specifically.

16      Q.   What do you mean by "not specifically"?

17      A.  I don't -- I don't know.

18      Q.   Okay.  How is -- is Mr. Fimrite or one of

19   Mr. Fimrite's entities paying back that debt

20   currently?

21      A.   He would keep the record of his payments,

22   so his records should indicate.

23      Q.   And did you ask him for his record of

24   payments to you before you responded to discovery in

25   this?

Page 67

1              D. FIMRITE

2  John, and we'll see if it's responsive.

3          MR. McHUGH:  Great.

4      Q.  You do disclose in this a 2011 written

5  agreement, correct?

6      A.  Correct.

7      Q.  Okay.  So we're going to go ahead and mark

8  Exhibit 3 as that 2011 written agreement.  It's a

9  document bearing -- starting with Bates EFGLLC002080.

10          (Exhibit 3 is marked for identification and

11  attached hereto.)

12      Q.  Do you see that, Mrs. Fimrite?

13      A.  Yes, I do.

14      Q.  Okay.  And just to kind of orient ourselves

15  in time -- let me find my cursor.  Here we go.  I'm

16  going to show you the last page, which has the date

17  on it.

18          Do you see it?  It's April --

19      A.  Yes.

20      Q.  -- or February 17th, 2011.

21      A.  Yes.

22      Q.  Is that your signature underneath that?

23      A.  Yes, it is.

24      Q.  Is that two people's signatures, or is that

25  one signature?

1                    D. FIMRITE

2    A.  Looks like two to me.

3    Q.  Okay.  Who's the second signature?

4    A.  It would be mine.

5    Q.  And then the first signature is Elroy's?

6    A.  Yes.

7    Q.  Okay.  All right.  I'm going to go through

8  this agreement with you.  First, just to kind of

9  organize ourselves, you see that you are referred to

10  as DF in this agreement?

11        DFG AG is referred to DFG, and Mr. Fimrite

12  is referred to as DEF.  Do you see that?

13    A.  Yes.

14    Q.  Okay.  All right.  And so the first whereas

15  clause says that, "DFG has employed Li Xing Ru of

16  Guangzhou, PR China, for the past six years, 2004

17  through 2010, for an agreed annual salary of 24,000

18  US dollars, a total of 144,000 US dollars."

19        Do you see that?

20    A.  Yes, I see that.

21    Q.  Okay.  And the next paragraph says that,

22  "Mr. Ru, during those six years, has developed unique

23  and proprietary rubber devulcanization technologies,

24  hereinafter the IP."

25        Do you see that?

1              D. FIMRITE

2    A.  Yes, I see that.

3    Q.  Okay.  Jump down to paragraph 6.  And it

4  says that, "DFG has paid or caused to be paid to

5  Li Xing Ru 44,000 US dollars, plus various extension

6  fees and expenses, and has agreed with Li Xing Ru to

7  a final payment of past compensation in the amount of

8  $100,000."

9        Do you see that?

10    A.  Yes, I see that.

11    Q.  Did you review this document before you

12  signed it?

13    A.  Yes.

14    Q.  Okay.  And did you have questions about

15  what the document meant?

16    A.  No.

17    Q.  Who prepared it?

18    A.  I don't know.

19    Q.  Did your husband provide it to you?

20    A.  Yes.

21    Q.  Okay.  Did you have edits to it?

22    A.  No.

23    Q.  Okay.  Paragraph 7 says, "Li Xing Ru has

24  agreed to transfer and assign certain of the IP

25  relating to the secret formulas and mixing technology

Page 70

1                    D. FIMRITE

2  intellectual property relating to the AMR and RU

3  technologies upon payment of 100,000 US dollars."

4          Do you see that?

5     A.  I see that.

6     Q.   Jump down to paragraph 11.  "DFG deems it

7  imperative to the protection of investments and

8  obligations that the exclusive rights to the AMR and

9  RU technologies be protected by completion of the

10  outstanding payment of 100,000 US dollars to Li Xing

11  Ru."

12          Do you see that?

13     A.  Yes, I see that.

14     Q.   And the next paragraph says, "DF."  That's

15  you, correct?

16     A.  That is correct.

17     Q.   "Has agreed to invest 125,000 Canadian

18  dollars with DFG to facilitate the payment of 100,000

19  US dollars to Li Xing Ru."

20          Do you see that?

21     A.  Yes, I see that.

22     Q.   Okay.  And the next paragraph says, "DF

23  will advance 125,000 Canadian dollars to DFG/GCL to

24  be applied as to 100,000 US dollars to Li Xing Ru."

25          Do you see that?

1          D. FIMRITE

2    A.  I see that.

3    Q.  Okay.  So you understood that under this

4  agreement, you were paying or lending to DFG $100,000

5  so that it could complete its obligations to Mr. Li

6  arising from his employment between 2004 and 2010,

7  correct?

8    A.  Yes.

9      MR. HINSHAW:  Objection to form.

10      Go ahead.

11  BY MR. McHUGH:

12    Q.  And if you go down to paragraph 6, it says,

13  "DFG shall prepare and submit to DF a proposed

14  ownership, control, and execution structure for the

15  exploitation of the IP.  The proposal shall offer DF

16  alternatives for participation in the ownership,

17  control, and execution of the IP or for the repayment

18  of a loan with the interest at the rate of blank

19  percent and a royalty of blank percent of future

20  sales revenue."

21      Do you see that?

22    A.  I do see that.

23    Q.  Was a proposed ownership, control, and

24  execution structure ever provided to you?

25    A.  I don't remember.

1                    D. FIMRITE

2      Q.   Okay.  You don't identify any further

3   agreements related to this in your interrogatory

4   response, correct?

5      A.   I don't.

6      Q.   Okay.  What was the interest rate agreed

7   upon between the parties as to repayment of this

8   loan?

9      A.   That was a discussion with Elroy and I.

10     Q.   Okay.  And how much was it?

11     A.   I don't remember.

12     Q.   Okay.  Is it written down anywhere?

13     A.   I don't know.

14     Q.   Okay.  How do you know if you're being paid

15  back your loan, if you don't know what the interest

16  rate is?

17     A.   Currently it is my understanding that the

18  payments are on -- that are being made on that second

19  mortgage cover the servicing of the debt interest.

20  So as far as I know, the principal amount has not

21  gone down, but the interest is being paid.

22     Q.   Has the principal amount on your mortgage,

23  the second mortgage, has that gone down?

24     A.   Not to my knowledge.

25     Q.   Do you have a mortgage that -- have you

1                    D. FIMRITE

2   refinanced or renewed that mortgage, that second

3   mortgage, since 2011?

4     A.   Yes.

5     Q.   When was the last time you did that?

6     A.   I don't remember the date.

7     Q.   Was it within the last two years?

8     A.   I don't remember.

9     Q.   Last three years?

10    A.   I don't remember.

11    Q.   Do you have any recollection as to when

12  that occurred?

13    A.   No.

14    Q.   Did you take out additional monies when you

15  renewed or refinanced that debt, that mortgage?

16    A.   I don't think so.

17    Q.   Okay.  Did you -- oh, strike that.

18        The next paragraph says, "Until such time

19  as the ownership, control, and execution structure

20  has been agreed upon by DF and DFG, the shares of GCL

21  or alternative nominee, and thus the ownership of the

22  AMR and RU intellectual property, shall be held

23  solely by DF."

24        Do you see that?

25    A.   I do.

Page 74

1           D. FIMRITE

2    Q.   So is it your understanding that you are

3   the owner of Gate Corporation?

4        MR. HINSHAW:  Objection to form.

5        Go ahead and answer.

6    A.   I don't know.

7   BY MR. McHUGH:

8    Q.   Okay.  But you've never agreed to an

9   ownership, control, and execution structure, correct?

10   A.   I don't remember.

11   Q.   Okay.  You have no memory of ever doing so?

12   A.   No, I don't remember.

13   Q.   And you did not produce any written

14   agreement as to that effect in this case?

15   A.   Don't think so.

16   Q.   Okay.  And would you agree with me, based

17   on your understanding of the agreement when you

18   signed it, that if you haven't reached that

19   agreement, you are the sole owner of Gate Corporation

20   and the technology?

21        MR. HINSHAW:  Objection to form.

22        Go ahead.

23   A.   By the paragraph, that would be indicating

24   that.

25   BY MR. McHUGH:

Page 75

1            D. FIMRITE

2    Q.  Okay.  Do you believe you own Gate

3  Corporation?

4    A.  We still have an amiable agreement.

5    Q.  That wasn't quite my question.  Do you

6  believe you own Gate Corporation?

7    A.  I don't know.

8    Q.  Okay.  The next paragraph says in the event

9  that you don't -- you cannot reach an amiable

10  agreement as to future ownership, control, and

11  execution of the IP, you'll arbitrate that dispute,

12  correct?

13    A.  That's what it says.

14    Q.  And you've never arbitrated that dispute,

15  correct?

16    A.  That's correct.

17    Q.  Okay.  In addition to the $125,000 that was

18  paid so that Mr. Li's employment agreement could

19  be -- for 2004 to 2010 could be completely paid, you

20  also lent money under this agreement directly to your

21  husband, correct?

22    A.  It would have been to an entity, I would

23  expect.

24    Q.  Okay.  So let's look at -- so let's go back

25  to paragraph 2 right here.  Under the "therefore,"

1                 D. FIMRITE

2    paragraph 2.

3        A.   Okay.

4        Q.   And it says, "DF shall fund the loan by

5    securing a second mortgage on her residence at

6    5630 Batu Road, Victoria, BC, in the amount of

7    $350,000 to provide the investment funds as well as

8    to provide interest and payment reserves and to

9    refinance debt obligations of DEF."

10           That's Douglas Elroy Fimrite, right?

11        A.   It would be his debt obligations, not him

12    personally.

13        Q.   Well, if there are debt obligations that he

14    owns that are not his, then they're not his debt

15    obligations.  This says "debt obligations of DEF,"

16    correct?

17        A.   Correct.

18        Q.   And that's what you understood it meant at

19    the time that you made that loan?

20        A.   I meant that it was his debt obligations

21    and not for him to go and buy cars and boats and

22    airplanes.

23        Q.   Sure.  Sure.  That he had personal debt

24    that he needed to restructure or refinance, and

25    that's what you were lending him money to do,

1                    D. FIMRITE

2   correct?

3       A.   According to the paragraph.

4       Q.   Okay.  And that was your understanding at

5   the time you did it, correct?

6       A.   That is correct.

7       Q.   Okay.  Now, according to this agreement,

8   your -- sorry.  According to this agreement, your

9   mortgage was going to be for $350,000, correct?

10      A.   I think it was a cumulative total of

11   $700,000.

12      Q.   Okay.  Do you -- so there's no discussion

13   of any amounts over the 350 in this agreement.  Do

14   you know where the other 350 -- how the other 350

15   came about?

16      A.   Oh, dear.  Help.

17      Q.   What happened?

18      A.   I just lost you all.  I clicked -- I was

19   trying to get to see the top of the document, and I

20   lost you.  I'm not sure how to get it back.

21      Q.   Oh, you can't see us, but you can hear us?

22      A.   I can hear you, but I can't see you.

23   Should I do --

24      Q.   Let me end the -- let me stop share and see

25   if that fixes it.  Just a second.

1                    D. FIMRITE

2      Q.   Okay.  Do you ever drive the Ford

3    Expedition?

4      A.   At least once every three weeks.

5      Q.   Just to keep its motor going?

6      A.   The battery.

7      Q.   Okay.  Who -- now, are they both leased?

8      A.   Yes.

9      Q.   Okay.  Who pays the lease on the F-150?

10      A.   One of Elroy's entities would pay the

11    lease.

12      Q.   Okay.  And who pays the lease on the Ford

13    Expedition?

14      A.   Same thing.

15      Q.   Okay.  Are they both from -- is it Ocean

16    Park Ford?

17      A.   Yes, they both are.  They both are.

18      Q.   Okay.  And how long have you -- I mean, a

19    typical lease is three years.  So these are not the

20    same vehicles you had in 2015, correct?

21      A.   No, they wouldn't be.

22      Q.   Okay.  Do you replace them approximately

23    every three years?

24      A.   Four maybe.

25      Q.   Okay.  And who's -- and are they both

1                    D. FIMRITE

2      Q.   When you say "we," that's you and Elroy,

3   correct?

4      A.   And our children and their friends and

5   grandchildren.

6      Q.   Okay.  Do you know how much is outstanding

7   on the mortgage?

8      A.   I'm going to -- not exactly, no.  I do not.

9      Q.   Do you know who holds the mortgage?

10     A.   Kokanee.

11     Q.   And how long has Kokanee held it?

12     A.   I'm not sure exactly.  I don't know.  They

13   were not the original mortgagor, so I don't know how

14   long.

15     Q.   Okay.  All right.  So what about the

16   utilities for the Kettle Valley property?

17     A.   That would be paid through Carey.

18     Q.   Okay.  I just want to make sure I have a

19   complete list here.  So Carey Holdings pays -- makes

20   payments on the first mortgage on your property at

21   5630 Batu Road.  It makes the mortgage payments on

22   your Kettle Valley condominium.  It pays the

23   utilities for 5630.  It pays the utilities for Kettle

24   Valley.  And it pays the lease payments on the two

25   cars titled in your name.

1          D. FIMRITE

2          Is that all correct?

3     A.  Yes.

4     Q.  Okay.  Any other payments that you're aware

5  of that Carey Holdings makes?

6     A.  Not that I can think of.  There may be

7  others that I can't think of.

8     Q.  Besides monies paid to it by EFG-related

9  entities, are you aware of any other source of income

10  for Carey Holdings?

11     A.  There is no other --

12          MR. HINSHAW:  Objection to form.

13  BY MR. McHUGH:

14     Q.  There is no other source of income for

15  Carey Holdings other than monies paid to it by EFG

16  entities, correct?

17     A.  Yes.

18     Q.  Okay.

19     A.  Revoked company.  It has no business.

20     Q.  Right.

21     A.  It's basically a bank account.

22     Q.  Have you ever told the bank that it is a --

23  that the holder of the bank account is a revoked

24  company?

25     A.  I have never.

Page 112

1                    D. FIMRITE

2  Holdings -- well, strike that.  Strike that.  All

3  right.  Give me one second, and we're going to switch

4  exhibits.

5          All right.  I'm going to mark as Exhibit 4

6  defendants Fimrite entities' second supplemental and

7  amended responses to plaintiff's first set of

8  interrogatories.  This was served December 23rd,

9  2019.

10         (Exhibit 4 is marked for identification and

11  attached hereto.)

12    Q.   Do you see the title of the document here?

13  I'm going to highlight it.

14    A.   Yes.

15    Q.   Okay.  All right.  I'm going to ask you a

16  question about some information in there because it

17  concerns payments to you.  So if we go down, there's

18  an entry for you.

19         Do you see that?

20    A.   Yes, I see it.

21    Q.   And it says that, "Doris Fimrite has

22  advanced loans in excess of 700,000 to EF Global

23  affiliates and Gate Corporation prior to the

24  formation of EFG America."

25         Do you see that?

1                    D. FIMRITE

2    A.  I do.

3    Q.  Okay.  And then you see, "These loans were

4  borrowed by Mrs. Fimrite with her home as security."

5  Do you see that?

6    A.  Yes.

7    Q.  Okay.  And then it says -- it gives the

8  total amounts.  "Payments pursuant to the debt

9  service were $79,613.68 in 2015."  Do you see that?

10    A.  I do see it.

11    Q.  Okay.  And if you go down a little bit

12  farther, we get to an answer related to Carey

13  Holdings.  And it says, "Carey Holdings is a revoked

14  company, but maintains a Canadian bank account for

15  convenience of accounting for and managing the debt

16  service obligations to Doris Fimrite."  And then it

17  says, "In 2015 repayments of $76,200 were made."

18         Do you see that?

19    A.  Yes, I see it.

20    Q.  Okay.  Sorry.  Just give me one second.

21         And we said that was Exhibit 4, right,

22  Lisa?  All right.  Now we're going to switch over to

23  Exhibit 5.

24         (Exhibit 5 is marked for identification and

25  attached hereto.)

Page 114

1              D. FIMRITE

2    Q.  Exhibit 5 is a document starting with Bates

3  CAPITAL0000900.  Do you see that there at the bottom,

4  Ms. Fimrite?

5    A.  Yes, I do.  Yeah, I do.

6    Q.  Okay.  All right.  I'm going to blow this

7  up because this one's kind of hard to read.  But do

8  you see here this top entry, "Interest, Capital

9  Loans"?

10    A.  Yes.

11    Q.  Okay.  And do you see that these are

12  showing payments to Kokanee Mortgage?

13    A.  I do.

14    Q.  In various amounts?

15    A.  Yes.

16    Q.  Okay.  And the total here is the same as

17  the total that we just looked at in the interrogatory

18  response as far as payments made to service debt owed

19  to you, not through Carey Holdings, correct?

20    A.  I don't know.

21    Q.  Okay.  Looking at this entry, do you see

22  any indication here that these payments are made on

23  debt owed to you?

24        MR. HINSHAW:  Objection.  Foundation.

25        Go ahead and answer.

1                    D. FIMRITE

2     A.   No.

3   BY MR. McHUGH:

4     Q.   And if we go to -- and if we go to page

5   with the Bates 956, you see a line entry here for

6   Doris Fimrite, right?

7     A.   Right.

8     Q.   And it discloses the amount owed to you as

9   $709,829.84.  Do you see that?

10    A.   I'm not seeing it.  I'm still seeing Fred,

11   and where -- I don't see the 7,000 figure.

12    Q.   Here.  I'm trying to highlight it.  It's

13   directly across over here.

14    A.   I'm not seeing it because that's where all

15   of you are.

16    Q.   Oh.  Then let me move it for you.  Does

17   that help?

18    A.   Yes.  Now I can see it.

19    Q.   Okay.  And if you look at the top of these

20   columns, this is a balance column.  The columns --

21   the two columns next to it are debits and credits.

22    A.   Okay.

23    Q.   And do you see that on this balance sheet,

24   on this general ledger, it does not disclose any

25   activity on the debt owed to you, correct?

1          D. FIMRITE

2          MR. HINSHAW:  Objection to foundation.

3          Go ahead.

4     A.  I don't know.

5  BY MR. McHUGH:

6     Q.   Okay.  Well, you don't see any debits or

7  credits associated with your loan, correct?

8          MR. HINSHAW:  Objection.  Foundation.

9     A.   Could that be because of the specific

10 month?  I don't know.

11 BY MR. McHUGH:

12    Q.   This is in two -- okay.  So accept my

13 representation that it is for an entire year.  It is

14 the full general ledger from January 1st, 2015, to

15 December 31st, 2015.

16    A.  I don't maintain that ledger.

17    Q.  I understand.  You do know how to read

18 them, though, right?

19    A.  Vaguely.

20         MR. HINSHAW:  Objection.  Foundation.

21         MR. McHUGH:  Okay.

22         MR. HINSHAW:  Go ahead.

23 BY MR. McHUGH:

24    Q.  And you don't see any evidence here of any

25 payments being made to your loan, correct?

1              D. FIMRITE

2         MR. HINSHAW:  Objection.  Foundation.

3         Go ahead.

4     A.  No.

5   BY MR. McHUGH:

6     Q.  I'm sorry.  What was that?

7     A.  I don't see any debits or credits.

8     Q.  Okay.  And if we flip back real quick to

9   Exhibit 4.  So we looked at the 79,000.  That's the

10  payments reflected to Kokanee in 2015, and then an

11  additional $65,251.29 in 2016 paid on the Kokanee

12  Mortgage portion of the loan.

13        Do you see that?

14    A.  I see it.

15        MR. HINSHAW:  Objection to foundation.

16        Go ahead.

17  BY MR. McHUGH:

18    Q.  So as we saw before, in addition to the

19  direct payments to Kokanee Mortgage, there are also

20  payments made through Carey Holdings, and we get that

21  answer on page 8 of Exhibit 4.  "In 2015 repayments

22  of $76,200 were made, and in 2016 repayments of

23  $97,543.49 were made -- were paid against prior

24  outstanding debt service obligations."

25        Do you see that?

1              D. FIMRITE

2    A.  I see it.

3         MR. HINSHAW:  Objection to foundation.

4    BY MR. McHUGH:

5    Q.  Okay.  So I did a little math, and unless

6    you want me to pull up a calculator and show it to

7    you, the total amount disclosed between those two is

8    $155,813.68 in 2015.

9         It is your understanding that all of that

10   was interest payments, correct?

11        MR. HINSHAW:  Objection to foundation.

12        Go ahead.

13   A.  No, because as I said previously, that part

14   of the payments made on the property that I reside

15   in, the 5630, were -- part of it would have been tax,

16   part of it would have been interest, and part of it

17   would have been principal.

18   BY MR. McHUGH:

19   Q.  But we saw in the general ledger that

20   there's no reduction of principal during two

21   thousand --

22   A.  I didn't do -- I didn't make the ledger

23   entries, so I don't know.

24   Q.  Okay.  But your understanding is actually

25   that some portion of this $155,000 is -- that was

1            D. FIMRITE

2  paid in 2015 should be allocated to a principal -- to

3  a down payment of principal, correct?

4      A.  I don't know if there's another entry in

5  the ledger where it could have been transacted.

6      Q.  But it should be, correct?

7      A.  But I don't know if it isn't entered in

8  another area under another title in the transactions.

9      Q.  I'm not asking you to accept that it isn't.

10  I'm just asking you to -- whether or not you agree

11  that there was a principal payment made against the

12  debt owed to you in 2015.

13      A.  And I am saying that I don't see the full

14  ledger, and I don't know if it isn't recorded

15  somewhere else.

16      Q.  I'm not asking you about recording.  I'm

17  not asking you about how it was recorded.  I'm asking

18  your understanding of the nature of the debt owed to

19  you.  That it is your understanding that the payments

20  made in 2015 would have included some amount of

21  principal?

22          MR. HINSHAW:  Objection.  Foundation and

23  asked and answered.

24          Go ahead.

25      A.  And I still say that I can't see the full

1          D. FIMRITE

2   ledger, and I don't have access to see exactly where

3   all the records are made and how they're made and in

4   what names and titles.  So I can't acknowledge

5   something.  I can't say yes or no because I don't

6   know how these were recorded in the ledger.  They

7   could be -- could they be possibly somewhere else

8   under some title?

9   BY MR. McHUGH:

10      Q.   I want you to set aside the ledger.  All

11   mortgage payments -- all payments owed on your first

12   mortgage in 2015 were made by Carey Holdings,

13   correct?

14      A.   I would say yes.

15      Q.   And those payments included -- a portion of

16   those payments made on your first mortgage included

17   payment of principal amount, correct?

18      A.   I would say yes.

19      Q.   Okay.  If we do the total for 2016, it's

20   $162,794.78 in payments made either to Kokanee

21   Mortgage or to Carey Holdings.  So between those two

22   years, it is $318,000 -- I'm sorry -- $318,608.48

23   that was paid on debt service to you from EFG America

24   in 2015 and 2016.

25          Does that sound correct?

Page 121

1            D. FIMRITE

2     A.   Does that include -- does that include the

3  interest payments on the $700,000 debt?

4     Q.   It is all that is disclosed to us as far as

5  payments go.

6     A.   Then those amounts might well include -- I

7  don't know because I don't have the details

8  specifically, but I would check your figures and see

9  if those -- if your source of information might not

10  show that part of that would be interest on the

11  service of the $700,000.

12     Q.   I believe it is.  I believe it's payments

13  to Kokanee Mortgage and payments to CHL.  And if you

14  want to see the general ledger entries for payments

15  to CHL or to Carey Holdings, I can show those to you.

16     A.   So that amount may well be correct, but I'm

17  saying it is not taking down the payment of the CIBC

18  mortgage.  It's not -- it's -- like I say, it should

19  be, but I don't know if there's another entry

20  anywhere else that would indicate the $700,000

21  interest payments made reducing.

22     Q.   Understand.  Understand.  It's your

23  understanding that the $700,000 -- the payments on

24  the second mortgage, that is the $700,000 entry, it's

25  your understanding that those are paid by Carey

1          D. FIMRITE

2  Holdings, correct?

3     A.  Carey Holdings pays the interest on the

4  $700,000.  To my knowledge, no money has been paid on

5  principal.  Or if it has, I'm not aware.  I haven't

6  made myself aware.

7     Q.  Give me one second.

8     A.  Sure.

9     Q.  So going back to Exhibit 5.  On page 955,

10  here you see the entries for the Carey Holdings

11  payments.

12        MR. HINSHAW:  Objection to foundation.

13        Go ahead.

14  BY MR. McHUGH:

15     Q.  It says 2630 -- and I can highlight it if

16  you want me to point it out.  I mean, "2360 interco

17  Carey Holdings, Limited."  Do you see that?

18     A.  Yes, I do.

19     Q.  And then there's a series of payments that

20  designate Carey Holdings as the payee.

21     A.  Right.

22     Q.  Do you see that?

23     A.  I do.

24     Q.  Okay.  And your understanding is these are

25  the payments on both of your mortgages on the

1                    D. FIMRITE

2  primary -- on your house, right?  Kokanee Mortgage is

3  payment --

4        MR. HINSHAW:  Objection.  Foundation.

5  BY MR. McHUGH:

6     Q.   Okay.  Kokanee Mortgage is payment on the

7  Kettle Valley property, and Carey Holdings is payment

8  on the two mortgages on your house, correct?

9        MR. HINSHAW:  Objection to foundation.

10        Go ahead.

11     A.   Yes.  I think the two mortgages are paid

12  through Carey Holdings.  The 700,000 and the mortgage

13  on 5630 Batu Road for 255,000, those would be paid

14  through Carey Holdings.

15  BY MR. McHUGH:

16     Q.   Okay.  And in order for us to see if the

17  money that we see here going to Carey Holdings -- in

18  order to figure out if that is then used to pay

19  mortgage payments, we'd have to look at Carey

20  Holdings' bank accounts, right?

21     A.   I guess so, unless there's a further

22  indication anywhere else.

23     Q.   We would need some records of Carey

24  Holdings to see where that money goes, right?

25     A.   I guess.

Page 124

1            D. FIMRITE

2     Q.   Okay.  So would you agree with me -- well,

3   actually, maybe I'll do this so you don't have to

4   agree with me.  Probably would be happier if you

5   didn't have to agree with me.  No, it's not working.

6         All right.  Would you agree that the

7   primary amount of money paid is interest, and there's

8   only a minor amount of principal paid in 2015 and

9   2016?

10    A.   On which?

11    Q.   Between both of them.

12    A.   I would say yes, the primary amount would

13   have gone to interest.

14    Q.   Okay.  So in 2015 and '16, between the two

15   of them, there is in excess of $300,000 that is paid.

16   The majority of that -- primary amount of that is

17   paid as interest, correct?

18         MR. HINSHAW:  Objection.  Foundation.

19         Go ahead.

20    A.   I would have to do a calculation before I

21   could agree or disagree.

22   BY MR. McHUGH:

23    Q.   Okay.  I won't -- I did the calculation.

24   I'm decent at math.  But I'll stick by mine that it's

25   over $300,000 between the two years.

Page 125

1              D. FIMRITE

2         And when you were asked in discovery, you

3    stated that you don't report any of that interest

4    that is paid on loans owed to you.  You report none

5    of it as income, correct?

6    A.  That is correct, and it is correct.

7    Q.  Sorry?

8    A.  It is correct.

9         MR. McHUGH:  All right.  This is probably

10   a goods chance for a break, if people want to eat.

11   We're getting close to that time.  Does that work

12   for you, Scot?

13        MR. HINSHAW:  Yeah, that's good.  How

14   much do you think you've got to go still?

15        MR. McHUGH:  Oh, I think I probably have

16   at least another hour.

17        MR. HINSHAW:  Okay.  Doris, you want to

18   take a refueling break?

19        THE WITNESS:  How long shall I break?

20        MR. McHUGH:  How long do you want to take

21   a break for?

22        MR. HINSHAW:  Whatever is comfortable for

23   you to, you know, get just a bite, you know, get

24   some --

25        THE WITNESS:  15, 20, half an hour?

1          D. FIMRITE

2    Q.   Okay.  I'm sorry.  We went through a list

3   of all of the payments that Carey Holdings makes.

4   The two mortgage -- the three mortgage payments --

5   I'm sorry.  Two mortgage payments and your -- sorry.

6   Let me find my list.

7        The two mortgages on your 5630 property,

8   the utilities, and I think that's it.  What else do

9   you think that Carey Holdings pays?

10        MR. HINSHAW:  Objection.  Asked and

11   answered.

12        Go ahead.

13    A.   It pays for the mortgage on the house.

14   BY MR. McHUGH:

15    Q.   Okay.

16    A.   First mortgage.  The payments for the

17   $700,000 loan go through Carey Holdings.

18    Q.   Yes.

19    A.   Utilities are paid by Carey.

20    Q.   Okay.  Anything else get paid by Carey?

21    A.   The leases on my vehicles, as was indicated

22   in our earlier conversations.

23    Q.   Okay.  Is that true as of 2015, that you

24   understood that Carey Holdings was making the lease

25   payments on your vehicles?

1                   D. FIMRITE

2       A.   Yes.

3       Q.   Okay.  And did you understand that those

4    payments from Carey Holdings to the lease payments

5    were part of a debt owed to -- were repayment of debt

6    owed to you?

7       A.   It was my understanding that they are part

8    of a repayment of debts owed to me.

9       Q.   Okay.  And that's also true of the

10   utilities?

11      A.   That is correct.  Or any other monies paid

12   to me.  It would be repayment on a debt owed to me.

13      Q.   Okay.  So --

14      A.   Over and above those initial -- I don't

15   remember the amounts, but I think they're around

16   4,000, and the other one is around I'm going to say

17   7,000 or something for the mortgage, the $700,000

18   mortgage.

19           You have to understand that the interest

20   rate on a mortgage, on a second mortgage, is not

21   cheap.

22      Q.   I understand.  So the monthly payment on

23   your two mortgages is about $11,000?

24      A.   Yes, that's approximately.  I would have

25   to -- I couldn't say definitively, but it would be in